C. A. HARDY et al.

v.

JOHNS-MANVILLE SALES
CORPORATION et al.

Civ. A. No. M–79–145–CA.

United States District Court,
E. D. Texas,
Marshall Division.

March 13, 1981.

Rex Houston, Wellborn, Houston, Bailey, Perry & Adkinson, Henderson, Tex. and Scott Baldwin, Jones, Jones & Baldwin, Marshall, Tex., for plaintiffs.

Tony Chauveaux, Weller, Wheelus & Green, Beaumont, Tex. and Otto Ritter,

**1354**

Roberts, Harbour, Smith, Harris, French & Ritter, Longview, Tex., for defendants.

MEMORANDUM OPINION AND ORDER

ROBERT M. PARKER, District Judge.

In these asbestos-related cases, three motions are before the Court. The Defendant Forty-Eight Insulations has moved for an order permitting discovery and for leave to file cross-actions based upon a contribution theory of market share apportionment.[1] Sixteen defendants[2] have joined in a motion for reconsideration of the collateral estoppel order entered pursuant to *Flatt v. Johns-Manville Sales Corporation*, 488 F.Supp. 836 (E.D.Tex.1980). Alternatively, the sixteen defendants request the Court to certify the question of collateral estoppel for interlocutory appeal to the Fifth Circuit as provided for in 28 U.S.C. § 1292(b).

By separate order, the Court shall grant the two motions of Defendant Forty-Eight Insulations. The motion for reconsideration is denied; a contemporaneous order shall grant the interlocutory appeal certification.

I.

The Marshall cases represent a variety of asbestos-related claims. Some of the plaintiffs were insulation workers, while others claim exposure as pipefitters, carpenters and factory workers. Absolute identity of defendants does not exist on a case by case basis. That is, complaints may name Johns-Manville alone or include as many as twenty asbestos manufacturers. At latest tally, fifty-seven such cases were assigned to the docket of the undersigned in the Marshall

division alone. By two separate orders, the cases are consolidated for pretrial purposes and captioned collectively *Hardy v. Johns-Manville Sales Corporation*, M–79–145–CA *and consolidated cases.* (See Orders dated June 9, 1980, and October 23, 1980).

Ten years ago the widow of Clarence Borel tried her case to a favorable jury verdict before the Honorable Joe J. Fisher. *Borel v. Fibreboard Paper Products Corporation*, 493 F.2d 1076 (5th Cir. 1973) *cert. denied* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974), affirmed Judge Fisher's judgment entered on the jury findings. Since that time, the Eastern District of Texas has become inundated with asbestos-related litigation. Huge oil refineries and petrochemical plants in the southern end of the district have partially accounted for the existence of over three thousand plaintiffs within the Eastern District alone. The shipyards on the coastline and the presence of an asbestos manufacturing plant in Tyler, Texas, add to our burgeoning asbestos-related docket. In short, Judge Fisher's pioneering *Borel* trial and the industrial environment of the district have tended to contribute to the large number of asbestos-related filings.

Ten years after *Borel*, it cannot be seriously argued that asbestos exposure causes disease. So comfortable are we with that assertion, that a former Secretary of Health, Education and Welfare estimated that more than 67,000 human lives are taken each year by asbestos-related cancers.[3] Thus far in the litigation, asbestos has been found to be a competent producing cause of asbestosis and mesothelioma. *Borel, supra.*

Pulmonary asbestosis can best be described as a nonmalignant scarring of the lungs.[4]

---

1. The request for preliminary orders which would permit assertion of a "share of the market" contribution theory has been formally adopted by co-defendant Keene Corporation and informally joined in by Combustion Engineering.

2. The motion was filed by fifteen defendants— GAF Corporation, Eagle Picher Industries, Inc., Unarco Industries, Armstrong Cork Co., Nicolet Industries, Raybestos-Manhattan, Inc., Forty-Eight Insulations, Inc., Garlock, Inc., Crown Cork & Seal Co., Inc., (and Mundet Cork Corp.), Grefco, Inc., Keene Corporation, Ow-

ens-Illinois, Inc., Standard Asbestos Manufacturing and Insulation Co., Fibreboard Corp., and Celotex Corporation. Johns-Manville has adopted the motion.

3. Joseph A. Califano, *Hartford Courant*, Sept. 12, 1978, *as quoted in* 7 Fordham Urban L.J. 55 (1978).

4. Comment, "Asbestos Litigation: The Dust Has Yet to Settle," 7 Fordham Urban L.J. 55 (1978).

Asbestosis is generally cumulative; the continued exposure to asbestos dust and fibres increases both the risk and the severity of the disease. *Borel, supra.* Its latent period makes it legally and medically impossible to state with certainty when asbestosis was first contracted or which exposure to asbestos caused or contributed to the disease.[5] Knowledge of the danger can be attributed to the industry as early as the mid-1930's,[6] and the conduct throughout the industry despite the danger has been summarized as one of indifferent silence. *Borel, supra.*

The industry was also silent with respect to the dangerous relationship between asbestos and cancer. Mesothelioma is a form of malignant tumor of the chest and lungs; it may also effect the abdomen.[7] Extraordinarily painful and always fatal, it is a relatively rare form of cancer whose relationship to asbestos has been generally known since the late 1930's.[8] Like asbestosis, mesothelioma has a long latent period. *Borel, supra.* Rather unlike asbestosis, mesothelioma may result from one exposure to asbestos dust or fibres.[9]

Yet, products containing asbestos fibres have great utility in an industrial society. The heat resistant property of asbestos has made it important in insulation and pipe covering. Each year in the U. S. alone industry consumes one million tons of asbestos.[10]

Asbestos-related cases provide the courts with a classic utility versus danger evaluation. The Fifth Circuit has spoken with respect to marketing defects in insulation products. *Borel, supra.* Ten years after the verdict in *Borel,* considerable dispute exists with respect to its holding, and this Court's interpretation of that decision. The questions before the Court in the consolidated cases require serious consideration. The gravity of the issues raised and their interrelationship have prompted a rather lengthy response. While this Court may be accused of re-inventing the *Borel* wheel, the issues deserve more than a perfunctory response in a vacuum. With the brief review of the history of the litigation together with examination of the generic substance and its relationship to disease as a context, the Court may address the issues of market share liability and collateral estoppel.

## II.

The question of applicability of a market share apportionment of liability is before the Court on the basis of two motions: 1) a motion for leave to file a cross action based on the theory, and 2) a motion for leave to conduct discovery on the issue. Therefore, the Court is not thrust in the position of making a final adjudication of whether market share is applicable to the *Hardy* case or any of the other fifty-six cases. On the contrary, the Court shall grant the two motions for the cases generally, and the specific question of applicability to a particular set of facts is reserved for determination at trial.

The federal rules require the Court to grant leave to amend pleadings on a liberal basis. Rule 15(a), Fed.R.Civ.P. The Court should not exercise tighter reins in allowing pleadings merely because the matter sought to be plead is a novel legal issue; the rules require that discretion be freely given. 6 Wright & Miller, *Fed.Prac. & Proc.* § 1484. Because the Court has previously set limits on discovery in these cases, Defendant Forty-Eight has chosen to move for an order permitting discovery on the issue rather than waiting for co-defendants to challenge discovery efforts with motions for protective orders. In this context, the election by Forty-Eight Insulations is en-

**5.** *Borel, supra.*

**6.** Lanza, "Effects of the Inhalation of Asbestos Dust on the Lungs of Asbestos Workers," 50 PUBLIC HEALTH REPORTS at 6, 7 (1935).

**7.** Selikoff & Hammond, "Asbestos-associated Disease in the United States Shipyards," 28 CA—A CANCER J. FOR CLIN. 87 (1978).

**8.** *Fordham, supra* note 4, at 59.

**9.** New York Academy of Sciences, CANCER AND THE WORKER, 50 (1977).

**10.** *Fordham, supra* note 4, at 58.

tirely appropriate and is likely to result in judicial economy. The rule in this Circuit with respect to permitting discovery turns on whether the information sought is reasonably calculated to lead to admissible evidence if discovery is allowed. *Burns v. Thiokol Chemical Company*, 483 F.2d 300 (5th Cir. 1973); Rule 26(b)(1), Fed.R.Civ.P. The Rules of Evidence provide that admissible evidence is relevant evidence. Rules 401, 402, Fed.Rules of Evidence. Therefore, if discovery on shares of a relevant market is likely to lead to evidence which may be admitted as probative on an ultimate issue in the case, then discovery should be allowed to proceed.

The determination necessary for resolution of the discovery issue requires the Court to consider the relevance of the market share information. Therefore, the Court is required to evaluate the legal context in which the market share information might be offered. Despite the charge made by one defendant that any amplification by the Court on the relevance of market share information would violate the case or controversy limits of Article III and constitute an advisory opinion, the Court must in accordance with *Burns, supra*, make a preliminary evaluation of relevance.

Even if the law of the Circuit did not require the Court to make a preliminary determination that the market share discovery motion is calculated to lead to relevant evidence, the largest asbestos insulation manufacturer has asked for one.[11] Additionally, as a practical matter, the question is too serious to be disposed of in a one-page order. All parties, plaintiffs and defendants, should have adequate knowledge and notice of the Court's preliminary view of the viability of a system of market share liability.

It is important to note that the motions before the Court which relate to market share are not filed on behalf of a plaintiff;

these are defense motions. They raise an issue not yet considered in this district—the applicability of a *Sindell* theory of liability in the asbestos-related cases. *Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 163 Cal. Rptr. 132, 607 P.2d 924 (1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 286, 66 L.Ed.2d 140, (1980). In fairness, the movant has not couched the motion in these terms. Forty-Eight seeks the benefit of market share apportionment of damages without the burden of *Sindell* liability.[12]

At this point the *Erie*-alarm should sound in the hearts of legal scholars. *Erie Railroad Company v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Admittedly, in these diversity cases, the Court is venturing into territory without the benefit of charts drawn by the Texas Supreme Court. The legal reactionaries would have this Court sit as Judge Frank's ventriloquist's dummy waiting until, if ever, the Texas Supreme Court speaks. *Richardson v. C. I. R.*, 126 F.2d 562, 567 (2d Cir. 1942). One of the hazards of diversity jurisdiction is that federal courts occasionally face issues which the state courts have not yet had an opportunity to adjudicate. The asbestos-related litigation has thus far been conducted in the federal district courts in the State of Texas. This is not because the litigants perceive some unfair advantage in the federal forum; it is rather because these are true diversity cases and all the relevant asbestos law has been made in the federal forum. Therefore, if the decisions required the federal district judges to sit idly by waiting for an appropriate espousal by the Texas Supreme Court in the asbestos sphere, the litigants would have a long, perhaps interminable wait.

■ For these reasons, it is the prevailing view in this circuit that a federal court without benefit of guidance from the forum

---

11. At a hearing on the motion on December 19, 1980, the attorney of record for Johns-Manville asked the Court for "some type of definitive ruling as to what the Court's position on this matter at the time of trial is going to be." (Transcript pp. 12–13).

12. The record makes it clear that counsel for Forty-Eight is moving for market share which is "strictly contribution." (Transcript, p. 8). The inconsistency of this position was not undetected in the arguments raised in response by Johns-Manville. (Transcript, p. 13).

state's highest court or its state legislature should analyze the indications and determine the path the state would follow. *Delduca v. United States Fidelity & Guaranty Company*, 357 F.2d 204, 207 (5th Cir. 1966). The Court does not enter the field of prediction without some support for its role. *Commissioner v. Estate of Bosch*, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967); *Gates Rubber Company v. U. S. M. Corporation*, 508 F.2d 603 (7th Cir. 1975); *Roginsky v. Richardson-Merrell*, 378 F.2d 832, 851 (2d Cir. 1967). Therefore, it becomes the Court's duty to determine what course Texas law would follow were the issues of *Sindell* liability and market share apportionment presented to the state's highest court.

At this writing, three Courts have embraced a concept of enterprise or industry liability.[13] *Sindell, supra; Hall v. E. I. DuPont de Nemours*, 345 F.Supp. 353 (D.C. N.Y.1972); *Ferrigno v. Eli Lilly and Co.*, 175 N.J.Super. 551, 420 A.2d 1305 (1980). This new theory of liability is a hybrid, drawing from concepts of alternate and/or concurrent liability and the law of products liability to form a type of absolute liability. At the current time, it has been applied to only two types of products: 1) diethylstilbesterol, a synthetic estrogen commonly known as DES, in *Sindell* and *Ferrigno*; and 2) blasting caps in *Hall*. After the plaintiff proves exposure and injury caused by the product, the burden then shifts to the industry defendants to exculpate themselves by proving that an individual manufacturer's product could not have caused the injury. If the defendants cannot isolate causation, then liability is apportioned among the remaining defendants in accordance with a percentage share of a relevant sales market. Therefore, market share apportionment is an inherent part of enterprise liability which, at present, does not appear to stand as a viable contribution theory absent its use in the enterprise liability theoretical framework.

*Hall* was a pure form of industry-wide liability. Judge Weinstein, while not escaping critical comment,[14] found a national body of tort law which supported finding the major producers of blasting caps liable on an industrial tort theory. He noted that industry-wide liability depends on parallel conduct; specifically the failure of the industry as a whole to warn its users of risks involved in foreseeable uses of blasting caps. *Hall*, 374. The universal lack of an adequate warning throughout the industry forms a basis for an industrial tort. That is, the collective conduct of the industry as it related to safety was sufficient to impose a type of absolute liability.

While *Hall* was the imprimatur of the doctrine of absolute liability, *Sindell* stands as its premier authority. *Sindell, supra*. The California Supreme Court, with no small amount of emphasis, distinguished its holding from *Hall* and from the concept of industry-wide liability or enterprise liability.[15] *Id.*, 26 Cal.3d 610, 163 Cal.Rptr. 132, 607 P.2d 924. For the DES daughters, *Sindell* creates an absolute form of liability whose elements appear to be three in number:

1. The Plaintiff contracted a DES-related cancer or pre-cancerous condition (adenosis).

2. The Plaintiff's mother took a form of DES during pregnancy.

3. Extent of damages.

13. The argument has been advanced that *Gray v. United States*, 445 F.Supp. 337 (S.D.Tex. 1978) somehow precludes application of *Sindell*. *Gray* adhered to the rubric of product identification; it did not expressly or implicitly consider an application of enterprise liability. Therefore, its holding is not dispositive.

14. See *Sindell, supra*, at fn. 22; Comment, "DES and A Proposed Theory of Liability," 46 Fordham L.R. 963, 981 (1978); Comment, "Industry-Wide Liability," 13 Suffolk L.R. 980, 1008 (1979).

15. The Fordham Comment, note 13, *supra*, suggested seven elements of proof which the *Sindell* court rejected. They are: 1) an industry-wide standard of safety; 2) absence of proof of precise cause is not attributable to the plaintiff but is a result of industry conduct; 3) a generically similar defective product was manufactured by all defendants; 4) Plaintiff sustained injury which resulted from the defect; 5) the industry owed a duty to the plaintiff; 6) a high percentage of the industry is joined in the suit; 7) all defendants are tortfeasors.

The California court, on the strength of the relationship between DES and disease, apparently did not consider the issue of defectiveness as part of the plaintiff's burden of proof. After discussion of the disease relationship, the court justifies its imposition of absolute liability on policy reasons alone:

> In our contemporary complex industrialized society, advances in science and technology create fungible goods which may harm consumers and which cannot be traced to any specific producer. The response of the courts can be either to adhere rigidly to prior doctrine, denying recovery to those injured by those products, or to fashion remedies to meet these changing needs. . . . The most persuasive reason for finding plaintiff states a cause of action is that . . . between an innocent plaintiff and negligent defendants, the latter should bear the cost of injury.

*Sindell*, 610–611, 163 Cal.Rptr. 132, 607 P.2d 924.

After meeting two elements of proof, the burden shifts from the plaintiffs to the named defendants, each one to absolve itself of liability if it can. If a substantial share of the relevant market cannot isolate with competent proof *the* real tortfeasor, each defendant, as components of the industry, pays a proportional share of the judgment as represented by its percentage share of the market. *Id.*, 612, 163 Cal.Rptr. 132, 607 P.2d 924.

The key in *Hall* and *Sindell* is a problem of proof—the inability of the Plaintiff to identify the precise causative agent. Because both courts perceive the inability to be a circumstance not of the Plaintiff's making, the courts fashion a way around product identification, long recognized as part of a plaintiff's burden in proving causation in the traditional products liability action. In *Hall*, product identification was impossible because of the nature of the product itself—blasting caps. The *Sindell* problem bears a greater relation to the passage of time and the latent period from maternal exposure to the offspring's con-

tracting a DES-related cancer. The asbestos-related cases present a similar problem; it is impossible for the plaintiff to isolate the precise exposure or identify the manufacturer's product which caused his disease. In mesothelioma, the problem of identification is largely due to its long latent period. The cumulative nature of asbestosis is basically inconsistent with the legal concept of proof of a precise causative agent.

As the Eighth Circuit recognized, there is "no magic moment" when asbestosis or mesothelioma is contracted. *Karjala v. Johns-Manville*, 523 F.2d 155, 160 (8th Cir. 1975). For this reason the Fifth Circuit has accepted testimony of the worker and/or his co-workers of use of a particular product as circumstantial evidence of producing cause such that liability may be imposed on the manufacturer. *Borel*, 1094. In reaching that conclusion, the *Borel* language is particularly illustrative:

> In the instant case, it is impossible, as a practical matter to determine with absolute certainty which particular exposure to asbestos dust resulted in injury to Borel.

*Id.*, 1094.

Therefore, in the ten years since the trial of *Borel*, we have been imposing a kind of *Sindell* liability. The proof of causation as related to a particular Defendant's product has been, of necessity, limited to a worker's own testimony and testimony of co-workers who rely on memory with regard to products used over a twenty or thirty year period. Yet, for years, this is all that has been required of plaintiffs.

The sufficiency of this type of proof has been, and continues to be, challenged by the defendants. *Borel*, 1094; (Transcript, pp. 9, 15). If the challenge has any force, it gains it by operation of joint and several liability on the small producer. *Migues v. Nicolet Industries, Inc.*, 493 F.Supp. 61 (D.C.Tex. 1980). Even when settlements with co-tortfeasors are not an issue, the current pro-rata approach to apportionment results in unfairness to the small producer and a windfall to the larger producers. Market share liability cures this inherent defect,

and results in apportionment which bears some relationship to causative fault. Setting aside the policy reasons for shifting the burden from the plaintiff to the defendants, this is a compelling reason to apply a form of enterprise liability in the asbestos-related litigation.

The commentators have recognized the applicability of a form of industry-wide or enterprise liability to the asbestos-related claims. Comment, "DES and A Proposed Theory of Enterprise Liability," 46 Fordham L.R. 963, 974 at fn. 36 (1978); L. S. Berns & G. J. Lykos, "Sindell v. Abbott Labs—The Heir of the Citadel," 15 FORUM 1031, at 1038 (1980). Therefore, the applicability of the theory to the field of asbestos-related injury is not a conclusion without some academic support.

Yet, under *Erie*, the litmus test must be: is there adequate support in the existing law of the forum for the federal district court to conclude that Texas would follow *Sindell*? Two factors indicate support for this application of enterprise liability:

1. The existence in the law of the forum of concurrent liability, such that joint and several liability may be imposed on concurrent tortfeasors;

2. The movement within the forum to adopt a form of comparative causative fault for contribution purposes in strict liability.

It is well within the realm of interpretive legal comment to conclude that *Sindell* depends on the earlier California precedent which provides for concurrent and alternate liability among co-tortfeasors, *Summers v. Tice*, 33 Cal.2d 80, 199 P.2d 1 (1948). This is the law of Texas. *Landers v. East Texas Salt Water Disposal Company*, 151 Tex. 251, 248 S.W.2d 731 (1952). It is of some import to note the *Borel* court's reliance on *Landers*. *Borel*, 1095. *Landers* and *Summers* are for the Court's purposes precedential equivalents. Therefore, it is not unwarranted to assume that when faced with an expansion of existing law, the Texas Court would reach a *Sindell* result.

Finally, it is well understood by the bar and the bench that a collective rallying cry for comparative causative fault in contribution in products liability has been sounded.[16] Presently before the legislature, a products liability bill would provide a form of contribution based on comparative fault.[17] Justice Pope's concurrence in *Bailey, supra*, fn. 15, illustrates the uniformity of view on this issue. The fact that enterprise liability provides the only true means of comparative fault for asbestos-related cases indicates that an application of *Sindell* would find support in the state's highest court.

In summary, the Court holds that the *Erie*-indicators support a conclusion that the Texas courts would adopt some form of *Sindell* liability in the asbestos-related cases. Therefore, the preliminary evaluation of relevance which the Court is required to make in ruling on the discovery motion results in the determination that discovery on percentage share of a relevant market may lead to admissible evidence in the trials of some, and perhaps all, of these cases. At this point, absent the appropriate discovery, the Court is not prepared to rule

---

**16.** Pope, J., *concurring, Boatland of Houston v. Bailey*, 609 S.W.2d 743 (Tex.1980). Please consider the unison of voices at a products liability symposium at the University of Texas, Nov. 13, 1980. Russell McMains, "Indemnity and Contribution Revisited," University of Texas, Law Foundation (Nov. 1980); James B. Sales, "Defenses in Strict Tort Liability Action," University of Texas, Law Foundation (Nov. 1980).

Despite the apparent agreement between bench and bar that comparative causative fault is on the horizon, proponents disagree as to the source of its creation. The contingent forcefully arguing that the Supreme Court would create comparative fault by judicial fiat in considering a writ of error in a recent case has lost the force of its argument. On March 4, 1981, the Supreme Court refused the application for writ of error in the case which would have provided a springboard for comparative causative fault. *Bell Helicopter v. Bradshaw*, 594 S.W.2d 519 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n. r. e.). See 24 Tex.S.Ct.J. 260 (March 7, 1981).

**17.** Section 6 (S.B. 511 or H.B. 1136) would provide for contribution based upon comparative causative fault as well as permit a percentage reduction for a Plaintiff's contributory negligence.

on what constitutes a relevant market. Keene Corporation has filed a suggestion, but the determination of that question without the benefit of discovery is premature.

Therefore, the motions of Forty-Eight Insulations are GRANTED. Further, leave is hereby granted to any plaintiff in the consolidated actions to file amended pleadings which would support submission of the enterprise liability issue.

### III.

Collateral estoppel means issue preclusion.[18] In the motion for reconsideration filed on behalf of sixteen defendants in these consolidated cases, the Court has had occasion to consider the extent of issue preclusion which the June 9, 1980, order affects. The breadth of preclusion, as it relates to the specific objections raised by the defendants, warrants some clarification. Let it be understood at the outset that the Court adheres to its original position. *Flatt, supra,* speaks for itself in that regard. For that reason, the motion for reconsideration is overruled, and the June 9, 1980, order remains in effect with the following modification.

The objections which have prompted the Court to postscript *Flatt* are essentially four in number. The defendants argue that in applying federal law, the Court has erred. Secondly, they assert that Texas law adheres strictly to the doctrine of mutuality such that collateral estoppel is inappropriate as to any non-*Borel* defendant. Further, the defendants maintain the identity of issues requirement is not met in the non-insulator cases, and, therefore, collateral estoppel in those cases is inappropriate. In the end, they make a catch-all argument that the Court's order of June 8, 1980, violates due process because it tramples on the rights of corporate defendants in the name of judicial economy.

The universal thread running through all the arguments brought on behalf of the defendants is that the Court has incorrectly interpreted *Borel.* Therefore, it seems to be a prerequisite that the Court review its reading of the landmark decision, referred to by one writer as the "Magna Carta for widows of insulation workers."[19] If *Borel* provides any guidance to the lower courts, it certainly must be that the standard of conduct in the asbestos insulation industry was inconsistent with its duty to warn *at least prior to* 1964, when the first warning was placed on insulation containing asbestos fibres. Implicit in that determination is the apparent finding by the *Borel* court that insulation products containing asbestos are "unavoidably unsafe products." *Borel,* at 1088. Reaching that conclusion, the court readily accepts the proposition; i. e., that asbestos is a competent producing cause of mesothelioma and asbestosis. The *Borel* court relied extensively on the medical literature to reach that conclusion. *Id.,* 1083–1087. Finding the danger to be grave and the utility of the product to be unparalleled, the Court concluded that the only way for insulation products which contained asbestos to escape the strict liability conclusion that the products were unreasonably dangerous as marketed was for such products to have been marketed with an adequate warning. *Id.,* 1089. The warning standard was not met by the industry pre–1964 or for the *Borel* defendants post–1964 to 1969. *Id.,* 1104, 1106. With respect to insulation, the uncontroverted evidence is that there were no warnings prior to 1964 by any manufacturer. With the *Borel* framework adequately constructed, the Court may evaluate the specific arguments raised in support of the motion for reconsideration.

First and foremost, the Court continues to be persuaded that the choice of law made in *Flatt* is correct. That is, under any standard, federal law applies. *Aerojet-General Corporation v. Askew,* 511 F.2d 710

18. See Comment, "Collateral Estoppel: The Changing Role of Mutuality," 41 Missouri L.R. 521 (1976).

19. T. Henderson, "Product Liability Disease Litigation: Blueprint for Occupational Safety & Health," 16 TRIAL 25 (April, 1980, no. 14).

(5th Cir. 1975); *Willis v. Fournier*, 418 F.Supp. 265 (M.D.Ga.) aff'd without comment, 537 F.2d 1142 (5th Cir. 1976). Because of that, the Court is convinced that the application of collateral estoppel in these cases is correct. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); see also *Mooney v. Fibreboard Corporation*, 485 F.Supp. 242 (D.C. Tex.1980); and *Flatt, supra.*

Assuming, *arguendo*, that the application of federal law is incorrect, the mutuality arguments raised by the Defendants are without merit as a matter of state law. Strict mutuality, or an absolute mirroring of parties, is a legal concept subject to constant erosion and qualification. Comment, "Collateral Estoppel: The Changing Role of Mutuality," 41 Missouri L.E. 521 (1976). The demise of mutuality began with the concept of respondeat superior, and the effect given to prior adjudications against employees on employers. Consequently, the courts search for the familiar exception to the rule of mutuality—privity.

Texas has joined the other jurisdictions in taking a more liberal view of mutuality through the privity exception. The Corpus Christi Court of Appeals recently summarized the development in the Texas courts:

> Originally, mutuality was essential to the invocation of collateral estoppel. However, the Texas Courts have apparently abandoned the requirement of mutuality and have retained the requirement of privity only to the party against whom the plea of collateral estoppel is made ... So long as an essential issue of fact has been determined and adjudicated, the judgment therein will estop the parties or their privies from relitigating the same issues in a subsequent suit....

*Olivarez v. Broadway Hardware, Inc.*, 564 S.W.2d 195 (Tex.Civ.App.—Corpus Christi 1978, no writ). (citations omitted.)

This represents a conclusion of the effect of two Texas cases on the mutuality issue. *Benson v. Wanda Petroleum Company*, 468 S.W.2d 361 (Tex.1971); *Hardy v. Fleming*, 553 S.W.2d 790 (Tex.Civ.App.—El Paso 1977, writ ref'd n. r. e.).

Under the law of Texas, there can be no objection to a non-party invoking a plea of collateral estoppel. *Olivarez, supra.* Therefore, the Defendant's objection with respect to the plaintiffs is without merit. Collateral estoppel as a matter of state law may only be invoked against 1) a party, or 2) one in privity with a party to a prior adjudication. Therefore, for the non-*Borel* defendants the essential issue is a question of privity.

Texas recognizes the "identity of interest" rule of privity as set forth in Restatement of Judgments § 83(2). *Olivarez*, at 200. If the non-*Borel* defendants share sufficient identity of interests with *Borel* defendants, mutuality cannot bar the application of collateral estoppel. For reasons stated in Part II of the foregoing opinion, as well as those articulated in *Borel*, the Court holds that the non-*Borel* defendants share sufficient identity of interest such that the application of collateral estoppel would not conflict with the state standard.

As far as the insulation cases are concerned, the non-*Borel* defendants share precisely the same interests as do the *Borel* defendants, at least for the pre–1964 period. If exposure to any product occurs in a case prior to 1964, there can be no serious challenge to a claim of collateral estoppel on the ultimate issue of marketing an unreasonably dangerous product without an adequate warning, provided it is asserted by one exposed to insulation products.

The pre–1964 exposure insulation cases are the cases in which collateral estoppel may be entered in its broadest form and without serious objection. Included within the consolidated cases is at least one case in which the product at issue is not insulation but is insulated pipe,[20] the *Flatt* case. Assuming federal law applies, the ruling in *Flatt* remains correct. Because it has come to the attention of the Court that at least one of my brethren on the trial bench in

---

20. Garlock, Inc., a non-*Borel* defendant, has also urged the argument that its gaskets which

contain asbestos are not identical in law or in fact to insulation materials.

this circuit disagrees with the application of federal law, it may very well be that a considerable difference · of judicial opinion could exist on that issue.[21]

If *Flatt* is incorrect on the choice of law, collateral estoppel in its broadest terms may be incorrect in cases in which the claimed exposure is not related to an insulation product. This is so because the standard of conduct with respect to warning in the insulation industry was determined in *Borel*. The practice with respect to warnings on other products containing asbestos was not at issue in *Borel*; the conclusion with respect to the adequacy of the warnings is not identical. Therefore, collateral estoppel on the ultimate issue of marketing a product which was unreasonably dangerous to the ultimate user may be inappropriate as a matter of state law. *Benson, supra; Hardy, supra*. This does not mean that issue preclusion on inquiries necessary to the ultimate issue would be inappropriate. That is, *Borel* under any concept of privity would support collateral estoppel of the issue that asbestos is a competent producing cause of asbestosis and mesothelioma. The danger of the generic ingredient is the same irrespective of the finished product. The degree of danger may vary with the finished product, and, consequently, the duty to warn may vary.

Yet, under any standard, it would be a clear abuse of process in the courts to relitigate the issue of whether asbestos causes mesothelioma or asbestosis. This is the "can it" question versus the "did it" question in a particular case. Under any collateral estoppel application, the "did it" question is always litigated. The danger of the generic ingredient of the defendants products to the human user cannot be seriously questioned. To do so would unduly burden the plaintiff and slow the Eastern District to a standstill.

In addition to preclusion on the underlying issue of generic danger, *Borel* appropriately estops the duty issue for non-insulation products. Despite the rather well-known approach in this court that strict liability is not negligence, the *Borel* court imposed a negligence element in the duty to warn. Finding that manufacturers of products containing asbestos should have known of the danger to the human body as a result of inhalation of asbestos since the 1930's, the duty concept appears to be determined. *Borel, supra, Technical Chemical Company v. Jacobs*, 480 S.W.2d 602 (Tex.1972); *Crocker v. Winthrop Laboratories*, 514 S.W.2d 429 (Tex.1974). Cf. Comment, "Products Liability in Texas: Foreseeability and Warnings," 58 Tex.L.R. 1323 (1980). Therefore, for non-insulation products, evidence with respect to warnings should not be estopped. The question of adequacy of a warning, if any was given, is a jury issue in the non-insulation cases.

The due process arguments espoused by the defendants relate chiefly to verdicts which have resulted in victory for the manufacturers subsequent to *Borel*. The argument with respect to inconsistency as violative of a standard of fundamental fairness is adequately dealt with in *Flatt*, and does not warrant repetition of the Court's position. See also *Mooney, supra*, at 247–248. If there is a fundamental fairness issue, it relates to the non-insulation defendant for reasons stated above. On balance, that issue is cured by a paring down of the collateral estoppel issue to the question of disease-relation of the generic ingredient. Even so, the Federal Rules of Evidence provide a means to reach this bottom line result if by another vehicle—judicial notice of adjudicative fact.[22] Fed. R. of Ev. 201(b)(2) and (c). Relying upon the wealth of authority on this issue which is ·not subject to question,[23] judicial notice may be

**21.** See *McCarty v. Johns-Manville Sales Corp.*, 502 F.Supp. 335, Asbestos Litigation Reporter 2657 (S.D.Miss.1980).

**22.** For use of Rule 201 as it relates to medical facts not subject to rational dispute, see *Franklin Life Insurance Co. v. William J. Champion*

& *Co.*, 350 F.2d 115, 130 (6th Cir. 1965), *cert. denied*, 384 U.S. 928, 86 S.Ct. 1445, 16 L.Ed.2d 531 (1966) and *Golaris v. Jewel Tea Co.*, 22 F.R.D. 16, 19 (N.D.Ill.1958).

**23.** Part I, *supra*, and authorities cited therein.

taken of the disease-relation as an alternative to collateral estoppel.

Asbestos-related litigation is an appropriate candidate for collateral estoppel because it is a mass tort, a tort against a large undefinable group of people by industry. See Comment, "Asbestos Litigation: The Dust Has Yet to Settle," *supra* fn. 4. Because of differences in products within the industry, the application of collateral estoppel may vary somewhat with the product at issue. Yet, if *Parklane* is to be followed by this Court, its discretion to invoke collateral estoppel should not be questioned. For reasons first articulated in *Flatt*, justice as well as judicial economy requires that collateral estoppel be imposed. The defendants should not be allowed to litigate the plaintiffs to death on an issue which can best be described as a dead horse.

For the foregoing reasons and those previously articulated by the Court, the motion for reconsideration is DENIED. Contemporaneous to the entry of this opinion the Court shall enter an amended collateral estoppel order, and it shall enter an order with the appropriate findings for certification of the collateral estoppel issue to the Fifth Circuit Court of Appeals pursuant to 28 U.S.C. § 1292(b).

## AMENDED OMNIBUS ORDER

BE IT REMEMBERED that on this date pursuant to a motion for reconsideration filed on behalf of the Defendants the Court enters the following amended omnibus order in the above-captioned consolidated cases. After being fully advised, the motion for reconsideration is OVERRULED; however, the Court grants the request for amendment of the previous omnibus orders entered in the above cases on June 5, 1980, and October 23, 1980.

It is hereby ORDERED, ADJUDGED and DECREED that the omnibus orders entered in this cause be and they are hereby amended in the following respects:

1. Relying upon the Court's opinions in *Flatt v. Johns-Manville Sales Corporation*, 488 F.Supp. 836 (E.D.Tex.1980) and a contemporaneously entered memorandum in the *Hardy* case, collateral estoppel in some form shall be entered in each of the foregoing cases. Issue preclusion may extend to the ultimate issue of marketing an unreasonably dangerous product or be limited to cluster issues depending upon the particular facts of the case.

2. In any event, no evidence shall be introduced on the issue of whether asbestos causes either asbestosis or mesothelioma.

3. Further, no evidence shall be introduced on the issue of knowledge as it may relate to a duty to warn due to the res judicata and/or collateral estoppel effect of *Borel v. Fibreboard Paper Products Corporation*, 493 F.2d 1076 (5th Cir. 1973), *cert. denied* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974). In essence, no evidence shall be admitted with respect to a state of the art defense.

4. The Court does not alter the remaining portions of the consolidation orders, and such provisions remain in full force and effect.

5. It is further the opinion of the Court that Defendant's alternative Motion to Amend the Omnibus Order in the above-styled cases so as to permit Interlocutory Appeal pursuant to 28 U.S.C. § 1292(b) should be granted, and it is hereby. In connection therewith, the Court enters the following findings:

a. The instant case involves a controlling question of law regarding the applicability of collateral estoppel to multi-party product liability litigation;

b. That substantial ground for a difference of opinion exists as to the applicability of collateral estoppel based upon *Borel, supra*; and

c. That an immediate appeal of the Amended Omnibus Order would materially expedite and advance the ultimate termination of the litigation.

It is, therefore, ORDERED, ADJUDGED, and DECREED that the Motion to Amend to allow interlocutory appeal is GRANTED.

IT IS SO ORDERED.