**Stacey M. MIZELL, Plaintiff,**

v.

**ELI LILLY & COMPANY, a foreign corporation; Rexall Drug Company, a foreign corporation; E. R. Squibb & Sons, Inc., a foreign corporation; the Upjohn Company, a foreign corporation; Abbott Laboratories, Inc., a foreign corporation; and Carnrick Laboratories, a foreign corporation; jointly and severally, Defendants.**

**Carl E. MIZELL, Plaintiff,**

v.

**ELI LILLY & COMPANY, a foreign corporation; Rexall Drug Company, a foreign corporation; E. R. Squibb & Sons, Inc., a foreign corporation; the Upjohn Company, a foreign corporation; Abbott Laboratories, Inc., a foreign corporation; and Carnrick Laboratories, a foreign corporation; jointly and severally, Defendants.**

Civ. A. Nos. 80–1091–1, 80–1092–1.

United States District Court,
D. South Carolina,
Charleston Division.

Nov. 25, 1981.

Harvey M. Spar and Edmund Robinson, Shimel, Ackerman, Theos & Spar, Charleston, S. C., and Thomas H. Bleakley, Detroit, Mich., for plaintiffs.

William L. Pope, Robinson, McFadden, Moore & Pope, P. A., Columbia, S. C., and Blair C. Fensterstock, Dewey, Ballantine, Bushly, Palmer & Wood, New York City, for defendant, Eli Lilly & Co.

Glenn Bowers and James W. Orr, Nexsen, Pruet, Jacobs & Pollard, Columbia, S. C., for defendant, Rexall Drug Co.

John L. Choate, Nelson, Mullins, Grier & Scarborough, Columbia, S. C., for defendant, E. R. Squibb & Sons, Inc.

Michael T. Cole and Ann C. Osborne, Wise, Cole & Pearlman, P. A., Charleston, S. C., for defendant, The Upjohn Co.

William W. Watkins, Sr., Turner, Padget, Graham & Laney, Columbia, S. C., for defendant, Abbott Laboratories, Inc.

J. Rutledge Young, Jr., Young, Clement, Rivers & Tisdale, Charleston, S. C., for defendant, Carnrick Laboratories.

## ORDER

HAWKINS, District Judge.

This order issues upon two pre-trial motions heard September 3, 1981. Defendants made a joint motion to dismiss, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, on the ground that this court lacks jurisdiction over the subject matter of these actions. The motion was filed on February 27, 1981.

On February 17, 1981, plaintiff Stacey M. Mizell made six motions to compel further answers to interrogatories pursuant to Rule 37(a) of the Federal Rules of Civil Procedure.

## I. FACTS OF THE CASE

These actions arise out of the alleged use of the drug diethylstilbestrol (hereinafter DES) by Virginia McGuire while pregnant with Stacey McGuire Mizell in 1954. DES is a synthetic non-steroidal estrogen which was prescribed for use by pregnant women who had a history of miscarriages. At the time that she took this medication in 1954, Virginia McGuire was a resident of Santa Clara, California.

The plaintiffs, Carl E. Mizell and Stacey McGuire Mizell, were married in 1975 in California.

In 1976, twenty years after her birth, plaintiff Stacey Mizell allegedly learned that she had developed cancer. The alleged cancerous condition of Stacey Mizell was first diagnosed in February 1976 by Dr. William Singleton at Travis Air Force Base in California. On June 9, 1980, the plaintiffs filed this action in federal district court in Charleston, South Carolina.

The plaintiffs have failed to identify the manufacturer of the particular brand of DES taken by Mrs. McGuire.[1] Rather, the action is brought against the six named pharmaceutical corporations which allegedly manufactured and distributed DES in California during this period.

## II. MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

In determining whether the court has subject matter jurisdiction in this diversity action, it is established in this circuit that this court should look to the jurisdictional statutes of the State of South Carolina. *See, Proctor & Schwartz, Inc. v. Rollins*, 634 F.2d 738 (4th Cir. 1980). Defendants argue that section 15–5–150 of the South Carolina Code (1976), the "door closing statute", is controlling in these actions. Without question, the failure of the plaintiffs to a lawsuit to come within the provisions of the "door closing statute", when the defendants are foreign corporations, deprives the court of subject matter jurisdiction. *See, Rollins*, 634 F.2d at 740; *Cox v. Lunsford*, 272 S.C. 527, 252 S.E.2d 918 (1979). The "door closing statute" provides as follows:

An action against a corporation created by or under the laws of any other state, government or country may be brought in the circuit court:

(1) By any resident of this State for any cause of action; or

(2) By a plaintiff not a resident of this State when the cause of action shall

1. The drug was prescribed for Mrs. McGuire by her physician, Dr. Leon P. Fox. According to her deposition, Mrs. McGuire does not know which pharmaceutical company manufactured the drug she took, nor does she remember where the prescription was filled. (Memorandum for Defendants at 2–3).

have arisen or the subject of this action shall be situated within this State.

S.C. Code § 15–5–150 (1976).

All of the defendants in this case are corporations created under the laws of some state other than South Carolina. For Stacey Mizell and Carl Mizell to maintain these actions, they must either be found to be residents of South Carolina pursuant to section 15–5–150(1) or this cause of action must have arisen in South Carolina pursuant to section 15–5–150(2). As stated in the complaints, Stacey Mizell's mother, Mrs. Virginia McGuire, allegedly took the medication in question in 1954 when she was a resident of Santa Clara, California. Stacey Mizell's condition, which is the subject matter of this action, was first diagnosed in 1976 when, according to the complaints, she also was a resident of California. It is evident that these causes of action arose in the State of California.[2] Subsection two of the statute is clearly inapplicable since the causes of action did not arise in South Carolina. Therefore, the plaintiffs may maintain these actions only if this court is persuaded that the plaintiffs were residents of South Carolina within the meaning of section 15–5–150(1) at the time of the commencement of these lawsuits.

The appropriate interpretation to be given to the term "resident" in a particular case depends upon whether the term is intended to mean "actual residence" or "legal residence." "Actual residence" connotes something less than domicile and merely requires actual habitation within the state: intention is irrelevant. "Legal residence" is defined as the equivalent of "domicile." See, e. g., Phillips v. South Carolina Tax Commission, 195 S.C. 472, 12 S.E.2d 13 (1940). It is widely recognized throughout the United States that the two principal elements of domicile, physical presence in a locale and the intention to remain there indefinitely, must coexist before a new domicile is established in a particular location. "Domicile means the place where a person has his true, fixed and permanent

home and principal establishment, to which he has, whenever he is absent, an intention of returning." Gasque v. Gasque, 246 S.C. 423, 143 S.E.2d 811 (1965).

Although the South Carolina Supreme Court has construed section 15–5–150 to relate only to residence and not to citizenship, see, Cummings v. Wingo, 31 S.C. 427, 10 S.E. 107 (1889), the term "residence" has never been defined by that court in the context of the "door closing statute." The defendants have put forth some persuasive arguments for the proposition that the term "resident," as used in this jurisdictional statute, should be construed as the equivalent of "domicile." However, given the facts of this case, it is not necessary for this court to make a determination as to the correct interpretation of the term "resident" as used in section 15–5–150.

The court relies on the following facts in finding that both plaintiffs maintained actual physical presence in South Carolina and that both possessed an intent to remain indefinitely in South Carolina.

1. In May 1974, Carl E. Mizell was assigned to the submarine DANIEL BOONE, which was homeported in Charleston, South Carolina. He stayed with that ship until September 1975. While apparently still in Charleston, on June 18, 1975, Carl Mizell re-enlisted in the Navy and requested that Charleston, South Carolina, remain his duty station. However, he was assigned to California.

2. In 1977, Carl Mizell once again requested a Charleston, South Carolina assignment and, this time, was stationed in Charleston as of May 1977.

3. Carl and Stacey Mizell, who were married in 1975, bought a house off-base, in Ladson, South Carolina, soon after they arrived in South Carolina.

4. Stacey Mizell worked for the South Carolina Vocational Rehabilitation Department as a caseworker.

5. The couple registered their cars in South Carolina, and Stacey Mizell obtained a South Carolina driver's license.

---

**2.** Under South Carolina law, a cause of action arises where the injury or wrongdoing occurs.

See, Oshiek v. Oshiek, 244 S.C. 249, 136 S.E.2d 303 (1964).

6. Carl and Stacey Mizell became members of the Yeamans Park Presbyterian Church in Charleston, South Carolina.

7. According to the deposition of Stacey Mizell, the couple made the decision to move to Boise, Idaho, based solely on Stacey Mizell's medical decision.

8. Both plaintiffs testified in their depositions that they had intended to make South Carolina their permanent residence.

In *Ferrara v. Ibach*, 285 F.Supp. 1017 (D.S.C.1968), Judge Hemphill made the following statement concerning one who is drafted into military service: "In the case of a serviceman, there is a presumption that he retains the domicile which he had at the time of being drafted and the evidence to sustain a change of domicile to the place where he may be stationed must be 'clear and unequivocal.'" *Id.* at 1019. Judge Hemphill then found that the unusual circumstances of the defendant ex-military doctor placed him squarely within the exception to the normal serviceman rule. *Id.* This rule was also recognized by another South Carolina district court in *Bowman v. DuBose*, 267 F.Supp. 312 (D.S.C.1967). In *Bowman*, the court recognized that "[a] serviceman such as the plaintiff was at the time he moved to Sumter, . . . retains his domicile as of the date of his enlistment 'unless he indicates an intent to abandon such original domicile and adopt a new one.'" (citations omitted). *Id.* at 313.

While the *Bowman* court found that the party therein did not fit within the exception, that finding was made primarily on the basis of testimony from the plaintiff serviceman and his wife that they intended to retain their original domicile. The court distinguished *Deese v. Hundley*, 232 F.Supp. 848 (D.S.C.1964) and *Ellis v. Southeast Construction Co.*, 260 F.2d 280 (6th Cir. 1958), both of which had found a change in domicile, on this basis:

> In those cases, the serviceman had moved 'off-base,' renting in one case and purchasing in the other a home, but he had done so, in each case, *by his own testimo-*

ny, for the purpose and with the intention of thereby establishing a change of domicile . . . . In both cases, the Court gave effect to the serviceman's own declared intention to abandon his former domicile.

*Bowman*, 267 F.Supp. at 313, 314. Thus, the testimony of the parties involved was regarded as the primary indicator of intention in those cases, even when such testimony served their own interest in the matter.

The defendants argue that several facts point to the inescapable conclusion that neither Carl nor Stacey Mizell had the requisite intent to remain in South Carolina. On their 1978 and 1979 South Carolina income tax returns, both Carl and Stacey Mizell declared themselves to be non-residents of South Carolina. Furthermore, while living in South Carolina, Carl Mizell indicated on two Statements of Service that his state of legal residence was California. Pursuant to this document, Carl and his wife were exempt from paying South Carolina personal property taxes.

The Soldiers' and Sailors' Civil Relief Act provides that "*for the purposes of taxation* in respect of any person, or of his personal property, income or gross income," a serviceman shall not be deemed to have lost a former "residence or domicile" or to have acquired a new one "solely by reason of being absent [from the original state] in compliance with military or naval orders." 50 U.S.C.App. § 574(1) (1970). (Emphasis added). The Act is limited by its terms to residence or domicile "for the purposes of taxation." *Id.* The effect of this provision was to render Carl Mizell's military income and his personal property non-taxable in South Carolina. As shown by the affidavit of his tax preparer, his military income was also non-taxable in California during those years. Thus, he realized a substantial tax savings by taking advantage of the exemption provided by this Act. Plaintiff's claims of California residence for tax purposes does not import any broader intention than to pay only the amount of taxes legally required.[3]

---

**3.** It should be noted that the plaintiffs filed

South Carolina tax returns for 1980 as resi-

It is the finding of this court that the record, taken as a whole, shows with clear and convincing evidence that Carl E. Mizell and Stacey M. Mizell were actually living in South Carolina at the time suits were filed, and that they had established a permanent home in South Carolina with the requisite intent to remain indefinitely.[4] Accordingly, the plaintiffs met the requirements of either interpretation of the term "resident" as used in the "door closing statute." Subsection one of section 15–5–150 establishes these plaintiffs' right, as residents of the state of South Carolina, to bring suits against a foreign corporation in this state. This court, sitting in a diversity action, has jurisdiction over those suits which could be brought in state court under South Carolina law.

## III. CHOICE OF LAW

On February 17, 1981, plaintiff Stacey Mizell filed six motions to compel further answers to her interrogatories. Subsequently, the defendant filed memorandums in opposition to these motions, objecting to several of the interrogatories on the grounds that the information sought was irrelevant and immaterial to the subject matter of the action. Each of the interrogatories in question asked for information concerning the individual defendants' market share of the drug DES.

"[I]f discovery on shares of a relevant market is likely to lead to evidence which may be probative on an ultimate issue in the case, then discovery should be allowed to proceed." *Hardy v. Johns-Manville Sales Corp.*, 509 F.Supp. 1353, 1356 (E.D.Texas 1981). Plaintiffs acknowledged that the unanswered interrogatories would be relevant only if this court found that, under South Carolina choice of law rules, the California substantive tort law should be adopted as the substantive law governing this products liability case.[5]

A party should be required to answer only those interrogatories "reasonably calculated to lead to the discovery of admissible evidence." Fed.R.Civ.P. 26(b)(1). Accordingly, the court heard arguments on the choice of law issue at the pre-trial hearing on September 3, 1981.

The Supreme Court of South Carolina has not ruled on the precise choice of law question now before this court. In such an instance, this court must endeavor to decide the issue in a way it believes the Supreme Court of South Carolina would decide it if such questions were before it. *See, e. g., Hatfield v. Palles*, 537 F.2d 1245, 1248 (4th Cir. 1976); *Smith v. Regina Mfg. Corp.*, 396 F.2d 826, 828 (4th Cir. 1968). Under South Carolina choice of law rules, where an action is brought in one jurisdiction (here, South Carolina) for a tort committed in another (here, California), all matters relating to the right of action are governed by the *lex loci delecti* rather than the *lex forti*.

---

dents, since Carl Mizell no longer came under the Act after resigning from the Navy.

4. It is clear from the record that, shortly after the instant actions were filed, both plaintiffs moved to Idaho. The defendants argue that the plaintiffs had no present intent to remain in South Carolina at the time the suits were filed and cite plaintiff Stacey Mizell's statement at her deposition that she intended to move to Boise, Idaho, about a month or so prior to June 5, 1980, as proof of lack of intent to remain in South Carolina. This testimony does not deprive plaintiffs of South Carolina domicile. For a person to effect a change in domicile two elements are necessary. "He must take up residence at the new domicile and he must intend to remain there. Neither the physical presence nor the intention to remain is alone sufficient." *Miller v. Lee*, 241 F.Supp. 19, 22

(D.S.C.1965). If both elements must concur to establish domicile, plaintiffs could not have established it in Idaho prior to their actual move there. Hav'ng severed all connections with California, with no intention to return, in what state other than South Carolina could they be domiciled? Like the serviceman in *Ferrara*, the plaintiffs would be "homeless" unless "domiciled" in South Carolina. *Ferrara*, 285 F.Supp. at 1019.

5. Federal courts sitting in diversity cases apply the choice of law rule of the state in which they sit. *See, Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Accordingly, South Carolina's choice of law rules control in this action. *See, Miller v. Premier Corp.*, 608 F.2d 973 (4th Cir. 1979).

*See, Algie v. Algie*, 261 S.C. 103, 198 S.E.2d 529 (1973); *Oshiek v. Oshiek*, 244 S.C. 249, 136 S.E.2d 303 (1964). According to this rule, the substantive rights and liabilities of the parties are to be determined in accordance with the law of the place of injury (here, California); while procedural matters are to be determined in accordance with the law of the forum (here, South Carolina). *See, McDaniel v. McDaniel*, 243 S.C. 286, 133 S.E.2d 809 (1963).

As previously discussed, this cause of action arose in California. According to plaintiffs' complaints, Stacey Mizell's *in utero* exposure to DES, her development of cancer, and her discovery that DES allegedly caused her cancer, all occurred in California. Therefore, California must be considered "the place of the wrong." Thus, the plaintiffs' position is that, in the absence of some exception to the traditional rule, California substantive law should govern the right of the parties. Of utmost significance to the outcome of these actions, this body of substantive law would include the California Supreme Court's adoption of the novel tort theory of "market-share" liability advanced in *Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 607 P.2d 924, 163 Cal.Rptr. 132 (1980), *cert. denied*, 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1981).

In *Sindell*, the plaintiff Judith Sindell brought a class action suit against several drug companies, seeking to recover for injuries sustained as a result of the ingestion of the drug DES by their mothers during pregnancy. The defendants demurred to the complaint.[6] The trial court sustained the defendants' demurrers on the ground that the plaintiff Sindell admitted "she could not identify which defendant had manufactured the drug responsible for her injuries." *Id.* at 595, 163 Cal.Rptr. at 134, 607 P.2d at 926. On appeal, the California Supreme Court rejected Ms. Sindell's substantive arguments for imposing liability based on theories of enterprise liability, alternative liability, and concert of action. A slight majority of that California court then fashioned a new theory of tort liability and, on the basis of this new theory, reversed the judgments of the lower courts. This new theory was based on the earlier California case of *Summers v. Tice*, 33 Cal.2d 80, 199 P.2d 1 (1948).

In *Summers*, two hunters negligently shot in the plaintiff's direction, but plaintiff was unable to identify which defendant hit him. The court reasoned that after proving both were wrongdoers, it would be unfair to require plaintiff to identify which hunter hit him in such circumstances; because if the one pointed out was to escape liability, the other might also. The *Summers* court held that in those circumstances, the burden of proof shifted to the defendants "each to absolve himself if he can." *Id.* at 86, 199 P.2d at 4.

The *Sindell* court did not apply the *Summers* court's rationale entirely. As only some of the manufacturers of DES had been joined, the chance that any one of the defendants supplied the injury-causing drug was remote. The court reasoned that it would be unjust to require each defendant to exonerate itself as *Summers* would require. *Sindell*, 26 Cal.3d at 603, 163 Cal. Rptr. at 139, 607 P.2d at 931. Rather, *Sindell* requires that once the plaintiff has shown that the defendants in the action comprise a substantial share of the appropriate market, the burden of proof of causation-in-fact is shifted to the defendants. It is then the defendants' burden to demonstrate that they could not have made the drug that injured the plaintiff. If a defendant can carry this burden, it can exculpate itself from the action. If a defendant cannot carry this burden, then it can apportion its liability on a "market-share" basis. The court in *Sindell* set forth its holding as follows:

> We hold it to be reasonable in the present context to measure the likelihood that any of the defendants supplied the product which allegedly injured the plaintiff by the percentage which the DES

---

6. There are minor variations in the procedures employed as to the various defendants, but the *Sindell* trial court treated all motions as demurrers.

sold by each of them for the purpose of preventing miscarriage bears to the entire production of the drug sold by all for that purpose.

*Id.* at 612, 163 Cal.Rptr. at 145, 607 P.2d at 937.

Thus, the "market share" liability theory of *Sindell*, as undeveloped as it presently exists,[7] would be available for the plaintiffs' use if California substantive law is found to apply under South Carolina choice of law rules.

It is a well settled exception to the traditional conflicts-of-law rule of *lex loci delicti* that the law of the forum and not the law of the place of the wrong is controlling whenever the law of the place of the wrong is contrary to the public policy of the forum state. *See, e. g.*, 29 A.L.R.3d 603 (1970). The Supreme Court of South Carolina acknowledged this exception in *Rauton v. Pullman Co.*, 183 S.C. 495, 191 S.E. 416 (1937), although it was found not to apply in that case.

It is the opinion of this court that the application of the *Sindell* market share liability theory, which is an available theory of California substantive law, would violate the public policy of this forum. This conclusion is supported by a recent South Carolina district court decision in another DES case. In *Ryan v. Eli Lilly & Co.*, 514 F.Supp. 1004 (1981), there was no choice of law issue; rather, the *Sindell* theory was advanced as a cause of action to be embraced by the federal district court sitting in diversity jurisdiction. Judge Chapman declined to apply the *Sindell* theory in the *Ryan* case, saying:

The unequivocal law of South Carolina is the plaintiff in a negligence action has not only the burden of proving negligence but also the burden of proving that the injury or damage was caused by the actionable conduct of the particular defendant. Thus in *Messier v. Adicks*, 251 S.C. 268, 161 S.E.2d 845 (1968), a judgment for plaintiff was reversed because

where the cause of plaintiff's injury may be as reasonably attributed to an act for which defendant is not liable as to one for which he is liable, plaintiff has failed to carry the burden of establishing that his injuries were the proximate result of defendant's negligence.

*See also, Elledge v. Pepsi Cola Bottling Company*, 252 N.C. 337, 113 S.E.2d 435 (1960). The Supreme Court of South Carolina has not carved out any exceptions to this traditional rule. The Court places the burden of proof of proximate cause squarely on the plaintiff. Application of this burden-shifting theory would violate established public policy and fundamental principles of tort law and procedure in this state in a variety of ways. This Court declines to apply this theory in the present case.

*Ryan*, 514 F.Supp. at 1018, 1019. Market share liability represents a radical departure from the body of products liability law that has been developed in South Carolina. By removing the traditional requirement that the plaintiff identify the responsible manufacturer, the doctrine destroys the nexus between production of a defective item and the plaintiff's injury. As a result, liability is placed on defendants bearing no responsibility for the defective product.[8]

7. In her complaint, Sindell was unable to name a specific manufacturer responsible for her injuries. The trial court sustained the defendant's demurrer to the complaint and dismissed the action, based primarily on Sindell's inability to name the responsible manufacturer. *See, Sindell v. Boyle Drug Co.*, No. C169127 (Cal.Super.Ct.1977). On appeal, the court of appeals reversed the trial court, finding a cause of action under both an alternative liability and a concert of action theory. *Sindell v. Abbott Laboratories*, 85 Cal.App.3d 1, 149 Cal.Rptr.

138 (1978). The defendant's subsequent appeal on the demurrer resulted in the California Supreme Court decision which adopted the new theory without establishing any guidelines for its application.

8. For an analysis of the theory's probable impact, *see*, Newcomb, *Market Share Liability for Defective Products: An Ill-Advised Remedy for the Problem of Identification*, 76 Northwestern L.J. 300 (1981).

Therefore, this court will apply the substantive law of the forum, South Carolina, to this action, since to do otherwise would violate the public policy of this forum. Based on this decision, plaintiff's motion to compel further answers to interrogatories will be denied as the questions would be irrelevant under South Carolina substantive law.

## CONCLUSION

It is, therefore,

ORDERED, that defendants' joint motion to dismiss for lack of subject matter jurisdiction on behalf of all defendants be, and the same is hereby, denied. It is further

ORDERED, that plaintiffs' motions to compel further answers to interrogatories be, and the same are hereby, denied. It is further

ORDERED, that since these decisions involve controlling questions of law as to which there are substantial grounds for differences of opinion, and immediate appeal from this order may materially advance the ultimate termination of the litigation, the plaintiffs and defendants are hereby granted the right to seek immediate relief, if they be so advised, in the Court of Appeals for the Fourth Circuit, 28 U.S.C. § 1292(b), and, pending the seeking of such relief, further proceedings in this court are hereby stayed.

AND IT IS SO ORDERED.