Suzanne E. **TIDLER, et al., Plaintiffs,**

v.

**ELI LILLY AND COMPANY, et al., Defendants.**

Civ. A. No. 80–2795.

United States District Court, District of Columbia.

June 1, 1982.

James E. Turner, Washington, D.C., for plaintiffs.

Gail Starling Marshall, Hogan & Hartson, Washington, D.C., for defendant Eli Lilly and Co.

Barry J. Israel, Clifford & Warnke, Washington, D.C., for defendant Abbott Laboratories, Inc.

Eugene L. Chrzanowski, Galiher, Clarke, Martell & Donnelly, Washington, D.C., for defendant E.R. Squibb & Sons, Inc.

Michael L. Gassman, Drinker, Biddle & Reath, Washington, D.C., for defendant Merck & Co., Inc.

Mary Porter, Mahoney, Hogan, Heffler & Heald, Washington, D.C., for defendant The Upjohn Co.

## MEMORANDUM OPINION

### ARTHUR L. BURNETT, Magistrate.

On February 9, 1982 the plaintiffs [1] filed a motion to compel discovery of all defendants with reference to a number of questions in Plaintiffs' Second Set of Interrogatories regarding market share and distribution. Specifically, plaintiffs seek to compel defendants to furnish information about the specific share of the diethylstilbestrol (hereinafter DES) market they each had during the relevant period involved in this lawsuit.[2] All five (5) of the remaining defendants have filed oppositions, citing points and authorities in support thereof, asserting collectively that the interrogatories are not relevant to any issue in the case, they are overbroad, ambiguous, vague [3] and burdensome, and that they in-quire into matters involving work product and attorney-client privilege.

To commence our analysis, it is significant to note that in paragraph 4 of the complaint the plaintiffs collectively represented:

"Each individual plaintiff was, during her period of gestation, severely and permanently injured in her embryonic formation because of the exposure of her mother to DES, and are unable to identify or designate or determine the particular manufacturer or distributor of the drug DES ingested during the period of approximately nine (9) months before their birth."

Thus, it is obvious that the plaintiffs contemplate they will have a problem of "product identification" and "causation" in establishing as a part of each plaintiff's case in chief which pharmaceutical company's DES product was ingested by her mother, which allegedly caused each plaintiff's alleged injuries which are the subject of this suit. If we are to adhere to traditional principles of causation in product liability cases, a plaintiff would be required to prove that a man-

---

1. The caption of the case has been changed in view of the fact that the lead plaintiff, Gloria J. Reid, no longer remains as a party plaintiff. On May 6, 1982 a praecipe was filed with the Clerk dismissing without prejudice the cause on behalf of Gloria Reid. Originally there were twenty-one (21) plaintiffs and nine (9) defendants. There are now twelve (12) remaining plaintiffs and five (5) remaining defendants.

2. For example, interrogatory No. 3(a) asks: "Do you have knowledge of any study, review, or investigation undertaken, or about to be undertaken, to determine the market share of DES sales by manufacturers, for the years during which it was sold for use in the prevention of the accidents of pregnancy...." Interrogatory No. 4 in part inquires: "Do you have any information, whether it be by market study, letters, memoranda, word-of-mouth, or otherwise, as to which pharmaceutical manufacturer manufactured or distributed DES for use in the prevention of the accidents of pregnancy, in the United States or any section thereof, for the period 1952 through 1967?" Interrogatory No. 7 inquires: "What do you estimate the market share of your company for the production and distribution of DES for use in the prevention of the accidents of pregnancy during the period 1952 through 1967, and what is the basis of this estimate?" Interrogatory No. 8 inquires:

"What was the market share of your company in relation to the other named defendants for the manufacture and distribution of DES for use in the prevention of the accidents of pregnancy during the period 1952 through 1967, and what is the basis for that conclusion?" Interrogatory No. 9 inquires: "What was the aggregate market share of the five named defendants for the production, manufacture, and distribution of DES for use in the prevention of the accidents of pregnancy during the period 1952 through 1967, and what is the basis of your estimate?"

3. For example, Merck & Co., Inc. observes that plaintiffs' interrogatories fail to define "market," "market share" or "market studies," nor are any standards or criteria suggested for the defendants to be guided by in answering the interrogatories using these terms. Merck further observed that the interrogatories did not include any limitation as to wholesale or retail distribution and no limitation as to a particular form of DES. Merck represented that DES apparently was sold at retail in pill, tablet, liquid (elixir and injectable) and suppository forms, in various dosages at various times, and was put to, at least, six different uses, only one of which is at issue in this case.

ufacturer defendant's product caused the injury in question. See, Restatement of Torts (Second) §§ 402A, 433B (1965); Prosser, *The Law of Torts*, § 98 (1971).

Plaintiffs have contended that the market share theory of liability enunciated in the germinal case of *Sindell v. Abbott Laboratories,* 26 Cal.3d 588, 163 Cal.Rptr. 132, 607 P.2d 924, *cert. denied,* 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980) would permit the imposition of liability upon the defendants even in the absence of any product identification proof on the basis of the five (5) defendants having a substantial part of the DES market in the period in question based on their share of that market, and thus the information sought by their interrogatories is a proper subject of discovery. This Magistrate does not agree. First, it appears from numerous cases in this area dealing with DES that during the relevant period there were some two to three hundred pharmaceutical manufacturers and distributors of DES in one form or another, and thus it is highly questionable that the five (5) defendants[4] remaining in this case had a "substantial share" of the DES market, whatever that term means.[5]

Further, such a legal concept represents a radical departure from the traditional concepts of product liability law. *See, Ryan v. Eli Lilly and Company,* 514 F.Supp. 1004 (D.S.C. 1981) setting forth a comprehensive review of the authorities supporting the causation requirement. See also, *Mizell v. Eli Lilly and Company,* 526 F.Supp. 589 (D.S.C. 1981).

When the complexities of the actual distribution process are considered from the manufacturers through wholesalers, distributors, jobbers and other middlemen to the ultimate pharmacies from which the plaintiffs' mothers probably obtained the DES, a "market share" theory as proposed in *Sindell, supra,* would leave the question of causation and responsibility to rank speculation and guesswork. Even if the companies which accounted for ninety (90) percent of the nation's DES production in a given year were joined as defendants, the myriad of variables and uncertainties introduced by the distribution process would render it, at least, equally likely that the DES sold at a particular pharmacy and ingested by a particular plaintiff's mother was manufactured by a non-defendant.[6] Cf. *Namm v. Charles E. Frosst & Co.,* 178 N.J.Super. 19, 427 A.2d 1121 (App. Div. 1981).

Specifically, in this case which is brought on diversity grounds, it appears that this court would apply choice of law principles based on *lex loci* delicti—where the injury occurred—or the interest analysis theory, both of which indicate that Maryland substantive law would apply to the majority of the remaining plaintiffs, with two of the remaining plaintiffs' mothers apparently having obtained DES and ingested it in the

---

**4.** The five (5) defendants are: Eli Lilly and Company; Abbott Laboratories, Inc.; Merck & Co., Inc.; E.R. Squibb & Sons, Inc.; and Upjohn Company, Inc. Nor does the Magistrate find *Bichler v. Eli Lilly and Company,* 55 N.Y.2d 571, 450 N.Y.S.2d 776, 436 N.E.2d 182, 1982, persuasive on the issue of Lilly's share of the market, which was actually decided on a concert of action legal theory rather than market share liability theory.

**5.** The California Supreme Court did not define the term "substantial share" or establish percentages to aid courts wishing to apply that theory. *See,* Note, Market Share Liability for Defective Products: An Ill-Advised Remedy for the Problem of Identification, 76 Nw.L.Rev. 300 (1981).

Joining the manufacturers of a "substantial share," whatever that phrase means, of the DES introduced into some "market" provides no statistical or mathematical assurance that any defendant, in fact, bore any responsibility for the plaintiff's injuries. Thus, the DES ingested by any particular plaintiff's mother may not have come from any of the defendants in this case. Such a result suggests possible constitutional difficulties of taking property without due process of law, unless the Congress or a legislative body could enact a law with some rational basis or nexus which would withstand constitutional scrutiny.

**6.** It has been consistently represented in the parties' submissions and in the reported cases that DES was manufactured and prescribed generically and thus it is not possible to identify a particular form or item of DES with a particular manufacturer. Further, it appears that all DES was produced under the identical chemical formula.

District of Columbia. The District of Columbia courts have traditionally applied the *lex loci* doctrine, see, *e.g., Knight v. Handley Motor Co.,* 198 A.2d 747, 749 (D.C. App. 1964) and more recently have used the "interest analysis" approach, *e.g., Semler v. Psychiatric Institute of Washington,* 575 F.2d 922, 924 (D.C. Cir. 1978); *McCrossin v. Hicks Chevrolet, Inc.,* 248 A.2d 917, 921 (D.C. App. 1969), to determine the applicable law.

Recently, two (2) federal judges in Maryland have indicated that the courts of Maryland would reject the *Sindell* market share theory and would require proof of product identification and causation. See, *Thomas J. Neary, et al. v. Johns-Mansville Products Corp., et al.,* C.A. No. H 78–790, an asbestos case, in which Federal Judge Alexander Harvey stated that the Maryland courts, in his opinion, would not recognize the theory of the *Sindell* case and that he was satisfied that this theory of enterprise liability or market share "sharply conflicts with existing Maryland court law." Opinion, Trial Transcript at 101–104. Judge Shirley B. Jones in *Diamond v. Johns-Mansville Sales Corporation,* J.–79–2206, decided December 11, 1981, also rejected the enterprise theory as being applicable in Maryland. The court there stated that the Maryland courts have consistently held that plaintiff has the affirmative duty of proving by a preponderance of the evidence that the conduct of each defendant was a proximate cause of the plaintiff's injuries, citing *Robinson Express Transfer, Inc. v. Canton Railroad Company,* 26 Md.App. 321, 338 A.2d 335, 343 (Ct. Spec. App. 1975); *Giant Food, Inc. v. Washington Coca-Cola Bottling Company, Inc.,* 273 Md. 592, 332 A.2d 1, 7–11 (1975). See also, *Howard v. McCrory Corp.,* 601 F.2d 133 (4th Cir. 1979) (applying Maryland law); *Jensen v. American Motors Corp.,* 50 Md.App. 226, 437 A.2d 242, 247 (Ct. Spec. App. 1981).

Nor is this Magistrate satisfied that the District of Columbia courts would adopt the market share liability theory. In deciding a diversity case, a federal court is bound to apply the law of the forum. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). There is some indication that the District of Columbia courts might accept the theory of alternative liability, but that theory is not applicable in a DES case such as this one where *all* possible manufacturers of the DES in question are not joined. And in *Bowman v. Redding Co.,* 449 F.2d 956 (D.C. Cir. 1971), invoking the principle recognized by Restatement of Torts (Second) § 433B(3) with reference to two contractors, both of whom were negligent, but as to which the evidence was not clear as to which one had caused the plaintiff's decedent's death,[7] the court observed that the exceptions to the doctrine of causation embodied in section 433B(3) "are so limited and structured that it is evidence that they do not represent a disguised overturning or undermining of the main doctrine." 449 F.2d at 968. Thus, this case does not suggest that the District of Columbia Court of Appeals would accept the market share rationale. Further, *Bowman* was decided after February 1, 1971, after the time in which the District of Columbia Court of Appeals was bound by the precedent established by the United States Court of Appeals for the District of Columbia Circuit, and under the authority of *M.A.P. v. Ryan,* 285 A.2d 310 (D.C. App. 1971), the D.C. Court of Appeals is not bound by it.

Finally, plaintiffs have suggested that the concert of action theory would justify compelling answers to the interrogatories at issue. Citing *Bichler, supra,* in an effort to resolve a dilemma faced by DES daughters, plaintiffs seek to establish concert of action from parallel conduct and alleged inadequate testing and desire market share information to establish percentage of the market each defendant controlled during the relevant time to establish this concert of action. First, the Magistrate disagrees

---

**7.** Thus in *Bowman,* before section 433B(3) would justify shifting the burden with respect to causation, the jury would have to find that both defendants were negligent toward the decedent and that one or the other was the cause of the death. The doctrine was thus applicable only if all possible wrongdoers were before the court.

with the New York Court of Appeals and concludes that this court would find the jury instructions and evidence insufficient to establish concert of action. This Magistrate concludes that the sounder analysis of the facts under this theory is set forth in *Ryan v. Eli Lilly and Company, supra,* and *Payton v. Abbott Laboratories, Inc.,* 512 F.Supp. 1031 (D. Mass. 1981).

Furthermore, in this Magistrate's opinion, market share information would have no bearing on the question of liability under the concert of action theory. Each defendant proved to have participated in some culpable "agreement" or "conspiracy" or "common design" would be subject to joint and several liability to the plaintiff quite irrespective of the defendant's relative or absolute production of DES or sales volume. On a concert of action theory of liability "market share" is irrelevant since an injured plaintiff may pursue any one joint tortfeasor for the entire injury and such a tortfeasor may, in turn, seek contribution from the others who acted in concert with him or it.

Based on the foregoing reasons and analysis, the Magistrate finds it unnecessary to reach the question of privilege and applicability of work-product and attorney-client principles to market share information and data. In reliance on the precedents set forth above, and in view of the market share liability concept being such a radical departure from the body of products liability law, this Magistrate, as did the court in *Mizell v. Eli Lilly and Company,* 526 F.Supp. 589, 596–97 (D.S.C. 1981) will deny plaintiffs' motion to compel answers to the "market share" interrogatories at issue. IT IS SO ORDERED.