447 So.2d 908 (1984)
Lee Loyd COPELAND and Vaudeen Copeland, Appellants,
v.
The CELOTEX CORPORATION, Appellee.
No. 81-997.
District Court of Appeal of Florida, Third District.
March 6, 1984.
*909 Robles and Robles and Brian Weinstein, Miami, for appellants.
Shackleford, Farrior, Stallings & Evans and Clark Jordan-Holmes, Tampa, for appellee.
Before NESBITT, FERGUSON and JORGENSON, JJ.
JORGENSON, Judge.
This and Copeland v. Armstrong Cork Co., 447 So.2d 922 (Fla. 3d DCA 1984), released this same day, are cases of first impression in Florida involving difficult questions of causation in asbestos-related injuries. Lee Loyd Copeland brought an action, founded upon theories of negligence, *910 implied warranty and strict liability, against Celotex Corporation and fifteen other corporate manufacturers of asbestos products.[1] Vaudeen Copeland, Mr. Copeland's wife, joined him in bringing the action, alleging loss of consortium. Celotex moved to dismiss for failure to state a cause of action. The trial court dismissed with prejudice the Copelands' third amended complaint.[2] For the reasons which follow we reverse and remand for further proceedings consistent with the views expressed herein and in Copeland, 447 So.2d 922.

I
The third amended complaint alleged that Celotex and the fifteen other corporations, "at times material to this cause of action, engaged in the manufacture and distribution of asbestos insulation products which were used at various times by the Plaintiff in his trade or occupation and, as more specifically set out herein below, proximately caused the injuries of which he complains."
The complaint further alleged that Mr. Copeland was exposed to the asbestos insulation products while engaged in installation and "rip-out" operations during the course of his employment and that
[a]lthough Plaintiff can identify several of the products he utilized, he is unable to identify each and every hazardous exposure to insulation products that he sustained. Moreover Plaintiff would show that the asbestos insulation products that he was injuriously exposed to during his work life were virtually unidentifiable as to brand name after they were removed from their original containers. In that each exposure to such products caused or contributed to Plaintiff's injuries, Plaintiff says that the doctrine of joint and several liability should be extended to apply to each defendant herein.
21. In that Plaintiff is unable to identify each injurious exposure to the asbestos products, he would show the court that there is a substantial likelihood that he was exposed to products manufactured and/or distributed by each Defendant and that the Defendants as a group supplied virtually all of the asbestos products to which he was exposed.
The complaint then alleged that joint and several liability should be extended to Celotex and the fifteen other defendants through the use of market share liability, a theory of recovery first adopted judicially in Sindell v. Abbott Laboratories, 26 Cal.3d 588, 607 P.2d 924, 163 Cal. Rptr. 132, cert. denied mem., 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980).
In pleading their theories of recovery, the Copelands alleged that Mr. Copeland had "for a great number of years been continuously exposed to asbestos and asbestos insulation products, manufactured, processed, sold and distributed by the Defendants and their predecessors-in-interest"; that this exposure directly and proximately caused Mr. Copeland to develop asbestosis, cancer and other related physical conditions resulting in and directly causing him to suffer severe bodily injuries, permanently and totally disabling him; that the products were manufactured, distributed and intended for the use to which they were put, were being used in their intended manner, were not reasonably fit for their intended use and were therefore, in the stated context, unreasonably dangerous; *911 that Mr. Copeland was unaware of the products' hazards and defects and that the defendants had failed to warn him of these hazards and defects; that the defendants had impliedly warranted that their products were merchantable and fit for their intended use; that Mr. Copeland's presence was or ought to have been known or reasonably anticipated by the defendants; and that the implied warranty was breached "in that certain harmful matter was given off into the atmosphere at such time as Plaintiff carried out his work and duties causing him to be exposed to the asbestos and asbestos insulation materials manufactured and/or distributed by the Defendants."

II
In ruling on a motion to dismiss for failure to state a cause of action a court is strictly confined in its consideration to the allegations found within the four corners of the complaint. Pizzi v. Central Bank & Trust Co., 250 So.2d 895 (Fla. 1971); Emile v. Florida Power & Light Co., 426 So.2d 1152 (Fla. 3d DCA 1983); Dunnell v. Malone & Hyde, Inc., 425 So.2d 646 (Fla. 3d DCA 1983). A motion to dismiss is not a substitute for a motion for summary judgment. Dunnell; see Pizzi. All allegations in the complaint must be accepted as true, Emile; Dunnell; Kaufman v. A-1 Bus Lines, 363 So.2d 61 (Fla. 3d DCA 1978); Raney v. Jimmie Diesel Corp., 362 So.2d 997 (Fla. 3d DCA 1978); see Pizzi; a court is not free to speculate as to what may indeed be true or ultimately proven, Emile; Dunnell; Raney; see Pizzi; Kaufman. In ruling on a motion to dismiss, the fundamental question before the court is whether the one making the allegations would by proving them thereby establish a cause of action against the defendant. Pizzi; Kaufman. The motion must therefore be decided on questions of law only. Kaufman; Raney.
A complaint, to be sufficient, "must state a cause of action and ... contain [inter alia] ... a short and plain statement of the ultimate facts showing that the pleader is entitled to relief... ." Fla.R.Civ.P. 1.110(b). See Woodcock v. Wilcox, 98 Fla. 14, 122 So. 789 (1929). "[T]he very liberal rule long since adopted by [the supreme] court in personal injury cases is that it will be deemed sufficient to merely allege the particular act or omission causing the injury... ." Woodcock, 98 Fla. at 18, 122 So. at 791. "These facts should be so stated that the duty may appear plainly from them as alleged." Id.

III
In a modern products liability suit, recovery is generally predicated upon a trireme of negligence, implied warranty and strict liability. See, e.g., Clark v. Boeing Co., 395 So.2d 1226 (Fla. 3d DCA 1981). All three of these theories center upon an alleged inferiority in the product, an inferiority referred to in the legal as in the lay vernacular as a "defect." This defect is the cause of the alleged injury, and in a very general sense its existence must constitute under the respective theories of recovery a breach of a duty, a breach of a warranty and, under strict liability, the presence of an "unreasonably dangerous condition" in the product. Celotex argues for the first time the absence of any enumerated ultimate facts evincing a defect in the product in question. Aside from being untimely, see Fla.R.Civ.P. 1.140(b), this allegation is totally without merit.
The third amended complaint plainly alleges that when used for its intended purpose and in its intended manner, the product caused to enter into the working environment asbestos matter alleged to have caused in Mr. Copeland asbestosis, cancer and other serious physical injury, and that Mr. Copeland, at least, was unaware of this danger to him.[3] These allegations *912 of ultimate fact were sufficient to place Celotex on notice of the nature of the alleged defect.
Celotex's attempt to draw an analogy between exposure in years past to asbestos, a product the dangers of which are just now becoming known to the public, and the intentional usage of butter by a person on a nonfat diet, of salted peanuts by a person on a salt-free diet, of cigarettes, or of alcohol in excess, rises not even to the level of sophistry. As has been stated by our supreme court, "The user should be protected from unreasonably dangerous products or from a product fraught with unexpected dangers," West v. Caterpillar Tractor Co., 336 So.2d 80, 86-87 (Fla. 1976) (emphasis added). The Copelands have alleged sufficient ultimate facts of a defect to be allowed an opportunity to prove the truth of those allegations.

IV
The dismissal below was based upon allegations that the Copelands failed (1) to allege the time or specific place of exposure to the asbestos products and (2) to allege a product manufactured by Celotex. The unique difficulty faced by a plaintiff in pleading these matters as ultimate facts in a suit of this nature merits close attention.

A
The rules provide that "[f]or the purpose of testing the sufficiency of a pleading, averments of time and place are material and shall be considered like all other averments of material matter," Fla. R.Civ.P. 1.120(f). Such allegations of time and place are necessary, however, only where their absence renders a pleading so vague and ambiguous that the defendant cannot adequately frame an answer. Erwine v. Gamble, Pownal & Gilroy, 343 So.2d 859 (Fla. 2d DCA 1976).
Asbestosis is a disease whose cause generally is cumulative exposure to asbestos dust and fibres. Cf. Pereira v. Dow Chemical Co., 129 Cal. App.3d 865, 181 Cal. Rptr. 364 (1982) (chemical vapors). The cancers attributable to asbestos exposure, e.g., mesothelioma, may result from a single exposure to asbestos dust or fibres. Either disease, though, may be characterized by a ten to twenty-five or more year latent period between initial exposure and apparent effect. It is therefore difficult, if not impossible, to determine which exposure is responsible for the disease. See Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076, 1083, 1092, 1094 (5th Cir.1973), cert. denied mem., 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974); Hardy v. Johns-Manville Sales Corp., 509 F. Supp. 1353, 1354-55 (E.D.Tex. 1981), rev'd on other grounds, 681 F.2d 334 (5th Cir.1982).
The Copelands have not alleged a simple slip and fall; the injury alleged in their complaint is not one arising from a discernible compact event or series of events through which Mr. Copeland was instantaneously transformed from a whole person into an injured party, at a specific time in a specific place. The Copelands allege that over a number of years Mr. Copeland was exposed to asbestos while engaged in his occupation of installing and ripping out asbestos insulation products. There is no allegation, nor could there be logically, that at some definite and determinable time and place Mr. Copeland was stricken with asbestosis and cancer. The very nature of these diseases makes virtually impossible the pinpointing of a time and place of injury. Asbestosis would have resulted from the passing, at some indeterminable time, of a threshold of cumulative exposure to asbestos beyond which a person may not pass uninjured. Cancer resulted perhaps from the passing of a single, equally-indeterminable moment.
It may be that when this case passes beyond the pleading stage the Copelands will produce all the times and places of exposure they have alleged produced the injuries, if only in the form of Mr. Copeland's times and places of employment. In the context of a case of this nature, however, any requirement of pleading a specific time and place of injury would place an insurmountable burden upon a plaintiff. We hold, therefore, that the allegation of a *913 longtime exposure to the alleged defective product, such as asbestos, under these specifically alleged conditions constitutes sufficient ultimate facts of cumulative exposure injury (characterized in Copeland, 447 So.2d 922, as "creeping disease"). Such a pleading is, of course, also sufficient to support a claim for the alleged cancer injury which can, in fact, result from a single exposure. We can see nothing logical or fair in placing upon a plaintiff in a suit of this nature the burden of pleading specificity of time and place. In reaching this result we have been persuaded by the reasoning of other courts. See, e.g., Urie v. Thompson, 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949) (in a silicosis case the Court reasoned that "no specific date of contact with the substance can be charged with being the date of injury, inasmuch as the injurious consequences of the exposure are the product of a period of time rather than a point of time... ."); Karjala v. Johns-Manville Products Corp., 523 F.2d 155 (8th Cir.1975) ("there is rarely a magic moment when one exposed to asbestos can be said to have contracted asbestosis").[4]

B
Celotex alleged below and here argues that the Copelands' complaint was insufficient in that no product linking Mr. Copeland's injuries to Celotex was named in the complaint. The Copelands alleged in their complaint that the asbestos insulation products to which Mr. Copeland was exposed during his years of employment "were virtually unidentifiable as to brand name after they were removed from their original containers." In their complaint, the Copelands, therefore, joined as defendants manufacturers and distributors who as a group supplied "virtually all" of the asbestos products to which Mr. Copeland was exposed.
Normally, "the burden of proof that the tortious conduct of the defendant has caused the harm to the plaintiff is upon the plaintiff," Restatement (Second) of Torts § 433B(1) (1965). Just as the California Supreme Court recognized in Sindell, however, we now acknowledge that traditional theories of causation may not be realistic in light of contemporary advances in science and technology and the complexity of an industrialized society, such as ours, which creates harmful products that cannot be traced to a specific producer. See Sindell, 26 Cal.3d at 610, 607 P.2d at 936, 163 Cal. Rptr. at 144. "The response of the courts can be either to adhere rigidly to prior doctrine, denying recovery to those injured by such products, or to fashion remedies to meet these changing needs." Id. The response of a state of Florida's prominence at the close of the Twentieth Century must be to choose the latter path.
The Copelands anticipated in their complaint an extension of the theory of alternative joint and several liability, a theory must popularly exemplified by Summers v. Tice, 33 Cal.2d 80, 199 P.2d 1 (1948), and "codified" at section 433B(3) of the Restatement (Second) of Torts (1965). The extension of the alternative liability theory advanced by the Copelands was that effected by the California court in Sindell entitled "market share liability." With slight technical modification necessitated by the nature of the asbestosis injury, we adopt the reasoning of the California court and its conclusion with respect to market share liability.[5]
The alternative liability theory of Summers is, simply stated, that
[w]here the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm,
*914 Restatement (Second) of Torts § 433B(3) (1965).
In Sindell the California court declined to apply alternative liability in a situation where the likelihood existed that none of the named defendants actually caused the injury while an unnamed causative tortfeasor might escape liability altogether. See Sindell, 26 Cal.3d at 603, 607 P.2d at 931, 163 Cal. Rptr. at 139. The California court determined, however, that a negligent defendant could more justifiably be made to bear the cost of the injury than an innocent plaintiff, particularly where the delayed-effect nature of the injurious product contributed to the difficulties of proving causation. See id. at 611, 607 P.2d at 936, 163 Cal. Rptr. at 144.
From a broader policy standpoint, the defendants are better able to bear the cost of injury resulting from the manufacture of a defective product... . The manufacturer is in the best position to discover and guard against defects in its products and to warn of harmful effects; thus, holding it liable for defects and failure to warn of harmful effects will provide an incentive to product safety.
Id.[6]
In balancing the considerations of fairness and justice involved the California court held it to be reasonable to measure the likelihood that any of the named defendants supplied the defective product involved by the percentage of the entire industry's production of the defective product sold by each of them. See id. at 611-12, 607 P.2d at 937, 163 Cal. Rptr. at 145. Thus, if a manufacturer supplied seven percent of the entire production of the defective product it would bear seven percent of the total liability to a given plaintiff. If identification could be made in all asbestos cases, of course, it follows that this manufacturer would be a defendant in approximately seven percent of all asbestos cases. Under market share liability this manufacturer would be joined in all cases in which identification could not be made, but liable for only seven percent of the total damages in each case. Although the correlation cannot be perfect, it is close enough to satisfy considerations of fairness to all parties. See id. at 612 n. 28, 607 P.2d at 937 n. 28, 163 Cal. Rptr. at 145 n. 28. The California court noted that joinder of seventy-five to eighty percent of the market had been suggested as a necessary requirement for application of market share liability, see id. at 612, 607 P.2d at 937, 163 Cal. Rptr. at 145 (citing Comment, DES and a Proposed Theory of Enterprise Liability, 46 Fordham L.Rev. 963, 996 (1978)), but held that only a "substantial percentage" would be required, see Sindell, 26 Cal.3d at 612, 607 P.2d at 937, 163 Cal. Rptr. at 145. By joining less than 100% of the market, however, a plaintiff has already limited his recovery to less than 100% of the total damages. In order to avoid liability, the burden would be upon the defendant to prove that it could not have made the product which actually caused the plaintiff's injuries. See id. Defining the market and determining market share are matters of proof not susceptible to determination at the pleading stage of the proceedings, but the California court concluded that under market share liability
each manufacturer's liability would approximate its responsibility for the injuries caused by its own products. Some minor discrepancy in the correlation between market share and liability is inevitable; therefore, a defendant may be held liable for a somewhat different percentage of the damage than its share of the appropriate market would justify. It is probably impossible, with the passage of time, to determine market share with mathematical exactitude. But just as a jury cannot be expected to determine the precise relationship between fault and liability in applying the doctrine of comparative fault [citation omitted] ..., the difficulty of apportioning damages among the defendant producers in exact relation to their market share does not seriously militate against the rule we adopt. As we said in Summers with *915 regard to the liability of independent tortfeasors, where a correct division of liability cannot be made "the trier of fact may make it the best it can." [Citation omitted.]
Id.; accord McElhaney v. Eli Lilly & Co., 564 F. Supp. 265 (D.S.D. 1983); Hardy (applying the same principles to asbestos-related injuries); Ferrigno v. Eli Lilly & Co., 175 N.J. Super. 551, 420 A.2d 1305 (Law Div. 1980) (applying market share liability to damages only). Contra In re Related Asbestos Cases, 543 F. Supp. 1152 (N.D.Cal. 1982) (market share liability not suited for asbestos cases because of difficulty of ascertaining accurate division along market share lines and not appropriate where causative tortfeasors identifiable); Tidler v. Eli Lilly & Co., 95 F.R.D. 332 (D.D.C. 1982) (in DES case market share liability was not applicable because "substantial share" of DES market had not been joined and because District of Columbia had not yet adopted theory); Morton v. Abbott Laboratories, 538 F. Supp. 593 (M.D.Fla. 1982) (applying Florida law in a DES case the district court found no indication that Florida courts would do what we have now done); Starling v. Seaboard Coast Line Railroad, 533 F. Supp. 183 (S.D.Ga. 1982) (Georgia would not adopt market share liability); Prelick v. Johns-Manville Corp., 531 F. Supp. 96 (W.D.Pa. 1982) (the identity of at least one defendant who actually caused the injury precludes the use of market share liability, therefore question of whether Pennsylvania would adopt the theory not reached); Mizell v. Eli Lilly & Co., 526 F. Supp. 589 (D.S.C. 1981) (market share liability contrary to public policy of South Carolina); Martin v. Johns-Manville Sales Corp., No. 81-88, Civ. T-GC (M.D.Fla. Aug. 28, 1981) (even though Florida might adopt market share liability in DES cases, it would not do so in asbestos cases because of key factual distinctions); Ryan v. Eli Lilly & Co., 514 F. Supp. 1004 (D.S.C. 1981) (market share liability not applicable because "substantial share" of DES market had not been joined and because contrary to public policy of South Carolina); Payton v. Abbott Labs, 386 Mass. 540, 437 N.E.2d 171 (1982).
With Hardy the United States District Court for the Eastern District of Texas became the first court to apply market share liability in an asbestos case. The issue was before the court by virtue of one defendant's motions to file a cross-claim based upon the theory and to conduct discovery on the issue. See Hardy, 509 F. Supp. at 1355. As noted by the court in Hardy, the defendant sought the benefit of market share apportionment of damages without the burden of market share liability. See id. at 1356. In adopting market share apportionment and liability, while preserving the specific question of their applicability to a particular set of facts for determination at the trial, see id. at 1355, the court in Hardy reasoned as follows:
The asbestos-related cases present a similar problem [to that presented in Sindell]; it is impossible for the plaintiff to isolate the precise exposure or identify the manufacturer's product which caused his disease. In mesothelioma, the problem of identification is largely due to its long latent period. The cumulative nature of asbestosis is basically inconsistent with the legal concept of proof of a precise causative agent.
... .
[T]he current prorata approach to apportionment results in unfairness to the small producer and a windfall to the larger producers. Market share liability cures this inherent defect, and results in apportionment which bears some relationship to causative fault. Setting aside the policy reasons for shifting the burden from the plaintiff to the defendants, this is a compelling reason to apply [market share] liability in the asbestos-related litigation.
Id. at 1358-59. We adopt this reasoning, as we have noted, with slight modification of how we reach market share liability.
Market share liability, as developed in Sindell, is an extension of alternative joint and several liability as expressed in section 433B(3) of the Restatement (Second) of *916 Torts (1965). Under that theory it is assumed that only one tortfeasor is the actual causative force behind the injury. See Restatement (Second) of Torts § 433B(3), comments f, g, illustrations 9, 10, 11 (1965). This approach is quite satisfactory in asbestos-related cancer cases where only one exposure to the defective product may result in the injury. In asbestosis cases, however, the injury generally results from cumulative exposures which may be caused by multiple tortfeasors. That is, unlike cases of asbestos-related cancer where there may be multiple tortfeasors but only one actual causative tortfeasor, in asbestosis cases, with cumulative exposure injury, there may be not only multiple tortfeasors, but multiple causative tortfeasors.
We feel the modern rule with respect to market share liability in asbestosis cases, therefore, would more logically be reached via section 433B(2) of the Restatement (Second) of Torts (1965), which states as follows:
Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor.
The familiar casebook example of this type of injury is the pollution of a stream or lake by a number of factories which discharge impurities into it. See Restatement (Second) of Torts § 433B(2) comment c (1965). See also Hollie v. Radcliff, 200 So.2d 616 (Fla. 1st DCA 1967) (where plaintiff suffering from Parkinson's disease was struck by a car the driver of the car may be held liable for plaintiff's entire condition); Wise v. Carter, 119 So.2d 40 (Fla. 1st DCA 1960) (where slip and fall victim was subsequently involved in automobile accident jury could apportion damages if possible or place entire liability on tortious driver). The commentary adds that it is not essential to join in the action all potentially-liable defendants, see Restatement (Second) of Torts § 433B(2) comment c (1965), and that
[t]he reason for the exceptional rule placing the burden of proof as to apportionment upon the defendant or defendants is the injustice of allowing a proved wrongdoer who has in fact caused harm to the plaintiff to escape liability merely because the harm which he has inflicted has combined with similar harm inflicted by other wrongdoers, and the nature of the harm itself has made it necessary that evidence be produced before it can be apportioned. In such a case the defendant may justly be required to assume the burden of producing that evidence, or if he is not able to do so, of bearing the full responsibility. As between the proved tortfeasor who has clearly caused some harm, and the entirely innocent plaintiff, any hardship due to lack of evidence as to the extent of the harm caused should fall upon the former,
Restatement (Second) of Torts § 433B(2) comment d (1965). The obstacle to application of this theory noted in the Restatement, however, is that "[t]he possibility arises that there may be so large a number of actors, each of whom contributes a relatively small and insignificant part to the total harm, that the application of the rule may cause disproportionate hardship to defendants," Restatement (Second) of Torts § 433B(2) comment e (1965).
We believe the application of market share liability to section 433B(2) of the Restatement removes this obstacle, and further, that by this approach the market share apportionment of damages in asbestosis cases is more logically justified. Thus, in an asbestosis case, each tortfeasor's liability would, just as under the section 433B(3) approach, be apportioned according to his percentage share of the total market.

V
For the foregoing reasons, we hold that the Copelands' third amended complaint states as a matter of law a cause of action against Celotex. It remains to be determined by the factfinder (the principles espoused in Copeland, 447 So.2d 922, preclude *917 a summary judgment in favor of Celotex) what liability will ultimately lie against Celotex through application of the principles we have today adopted.[7]
Reversed and remanded for further consistent proceedings.[8]
NESBITT, Judge (concurring in part and dissenting in part):
I concur in that portion of the majority opinion which holds that the complaint sufficiently alleges a defect as well as the time and place of exposure; however, for the reasons which follow, I dissent from the remainder of the decision.
By the majority opinion, this court has chosen to follow the theory of market share liability first enunciated in Sindell v. Abbott Laboratories, 26 Cal.3d 588, 607 P.2d 924, 163 Cal. Rptr. 132, cert. denied, 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980).
The catalyst for the theory was the fact that plaintiffs through no fault of their own were unable to identify the manufacturer of DES pills ingested by their mothers many years earlier. In response to this problem, the Sindell court created a theory which relieves a plaintiff from proving who was the actual manufacturer of the product which caused the injury. While this obviously represents an abandonment of traditional tort liability, the court in Sindell argued that the theory of apportionment it created leaves the defendant manufacturers in the same position as they would be under the traditional concepts. Support for market share liability was also drawn from policy considerations which favor innocent plaintiffs over proven wrongdoers. Sindell, 163 Cal. Rptr. at 144, 607 P.2d at 936.
In my view, the raison d'etre of market share liability is not present on the facts of this case; thus we need not decide whether to follow Sindell. Even if it were necessary to make that determination, I would hold that the reasons given for the adoption of Sindell do not justify our departure from traditional tort principles.

PRODUCT IDENTIFICATION
The obstacle to recovery which has plagued most plaintiffs seeking compensation for an asbestos-related injury is their inability to identify the manufacturer of the product which caused their injury. The California decision recognized the basic tenet of tort liability that a plaintiff must identify the party who injured him, but concluded that an exception existed where the manufacturer could not be identified (through no fault of the plaintiff). Under that circumstance, market share liability would be appropriate.
The complaint in the present case alleges the following with respect to the identification issue:
20. Plaintiff alleges that he was exposed to asbestos insulation products in his occupation for many years, both as an installer and during rip-out operations. Although Plaintiff can identify several of the products he utilized, he is unable to identify each and every hazardous exposure to insulation products that he sustained. Moreover Plaintiff would show that the asbestos insulation products that he was injuriously exposed to during his work life were virtually unidentifiable as to brand name after they were removed from their original containers. In that each exposure to such products caused or contributed to Plaintiff's injuries, Plaintiff says that the doctrine of joint and several liability should be extended to apply to each Defendant herein. (emphasis supplied)
Where, as here, the plaintiff is able to identify at least one manufacturer who caused his injury, the reasons for imposing market share liability do not exist. On this basis, even the federal district court in the *918 state which authored the Sindell opinion declined to use market share liability. In re Related Asbestos Cases, 543 F. Supp. 1152, 1158 (N.D.Cal. 1982); see also Prelick v. Johns-Manville Corp., 531 F. Supp. 96 (W.D.Pa. 1982); Lyons v. Premo Pharmaceutical Labs, Inc., 170 N.J. Super. 183, 406 A.2d 185 (App.Div. 1979) (same rule with respect to alternative liability). Accordingly, I find that this is an inappropriate case in which to determine whether Sindell should be adopted in Florida and would decline to do so.[1] Nonetheless, because the majority has chosen to reach the issue, I present my objections to the adoption of market share liability.

ABANDONMENT OF THE CAUSATION-IN-FACT REQUIREMENT
The market share theory of liability has its roots in the doctrine of alternative liability first adopted in Summers v. Tice, 33 Cal.2d 80, 199 P.2d 1 (1948) and later incorporated into Section 433B.(3) of the Restatement (Second) of Torts (1965). However, unlike its progenitor, the market share theory fails to comport with the most basic causation requirements for tort liability.
The Summers rule holds that when independent acts of negligence are committed against a plaintiff by two or more actors, but it is proven that harm resulted from only one of them, the plaintiff will be relieved of proving causation, and the burden will be on the defendants to establish their innocence.
Under this rule, two of the main objectives of the causation-in-fact requirement, those of limiting the scope of potential liability and assessing moral blame, are still accomplished. See Products Liability  An Analysis of Market Share Liability, 34 Vanderbilt L.Rev. 1623, 1630 (1981); W. Prosser, Handbook of the Law of Torts, 236-237 (4th Ed. 1971). The scope of liability is limited in that only those defendants who might have been responsible for the plaintiff's injury are joined. In the typical situation, as in Summers, only two or three individuals may have been responsible. Moral blame may be assessed since each of the defendants acted negligently (whether or not his action in fact caused the plaintiff's injury) and one member of that group definitely caused the harm. While it must be admitted that the causation-in-fact requirement is somewhat relaxed under the alternative liability theory, such a theory does not contravene this traditional tort concept.
When the DES cases emerged in various parts of the country, courts and commentators sought ways to afford injured plaintiffs relief. See, e.g., Comment, DES and a Proposed Theory of Enterprise Liability, 46 Fordham L.Rev. 963 (1978). At least one court applied the alternative liability theory, see Abel v. Eli Lilly & Co., 94 Mich. App. 59, 289 N.W.2d 20 (1980); however, the court in Sindell pointed out several reasons why a pure application of Summers would not work in a DES case. The obvious inability of plaintiffs to identify all of the possible tortfeasors and to ensure that the actual tortfeasor was before the court led the California court to determine that an adaptation of Summers was necessitated.
*919 I agree with Sindell that the Summers theory could not be applied; however, it seems to me that the modification proposed by the California court stretched the causation-in-fact requirement to its breaking point. See Payton v. Abbott Labs, 386 Mass. 540, 437 N.E.2d 171, 188 (1982). First, the new theory replaced the Summers requirement that all possible wrongdoers be joined with the necessity that a substantial share of the market be made a party. In doing so, the scope of liability which was limited to a few defendants in Summers has been expanded to include those with no greater connexity to the plaintiff than that they manufactured a product of the type which injured the plaintiff. Since the Sindell court failed to define the relevant market,[2] plaintiffs are free to pick and choose their targets from all around the country, see Sindell, 163 Cal. Rptr. 147, 607 P.2d at 939 (dissenting opinion), leaving it to the defendants to prove their innocence.[3]
Secondly, the Sindell theory dissipated the moral blame element of the causation requirement by dispensing with the notion that the actual wrongdoer be before the court and demanding only that the defendants be tortfeasors. The fallacy of such a theory was pointed out by the dissent in Abel v. Eli Lilly & Co., 289 N.W.2d at 32:
Some liability of one defendant must precede drawing in others. For instance, if none is identified, why should we not conclude none are liable? Further, to shift proof of damages to defendants requires proof of some liability, and this means identification of at least one party at fault; otherwise, proof of damage becomes the substitute for proof of liability.
The result reached by the majority today further obliterates the distinction between liability and damages. They conclude that Section 433 B.(3), which was the steppingstone for market share liability in the DES context, is inappropriate for asbestosis cases. Instead, they rely upon Section 433 B.(2) which provides:
Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor.
This section, however, contemplates the situation where two or more tortfeasors actually harm the plaintiff, and the only difficult question is how much harm each has caused; thus, the examples of several factories which each pollute a stream, or successive automobile accidents, in each of which the plaintiff is harmed. See Wise v. Carter, 119 So.2d 40 (Fla. 1st DCA 1960). In these situations, liability is clear, damages are not. See Abel, 289 N.W.2d at 31 (dissenting opinion). Accordingly, the Restatement provides that the burden of proof as to apportionment (not liability) is upon the defendants. See also Restatement (Second) of Torts § 433 B.(2) comment c (1965) ("the reason for the exceptional rule ... is the injustice of allowing a proved wrongdoer who has in fact caused harm to the plaintiff to escape liability merely because the harm which he has inflicted has combined with similar harm inflicted by other wrongdoers," Bottazzi v. Petroleum Helicopters, Inc., 664 F.2d 49 (5th Cir.1981) (plaintiff not precluded from recovering from two tortfeasors, each of whom injured plaintiff despite fact that *920 damages allocable to each could not be ascertained).
In the present case, it is not clear that each of the defendants has injured the plaintiff. Thus, unlike the cases considered under Section 433 B.(2), the basic issue here is liability, not apportionment of damages. By using this section, the majority has confused plaintiff's inability to allocate damages with his inability to prove liability.
In light of the foregoing, I find that the market share theory (whether based on Section 433 B.(2) (or B.(3)) would eliminate one of the fundamental bases of tort liability.

PRACTICAL CONSIDERATIONS
As a rejoinder to the argument that liability is imposed without the ordinary showing of causation, the majority in Sindell claims that each manufacturer's liability will approximate the damages caused by the defective product which it has manufactured. Sindell, 163 Cal. Rptr. 145, 607 P.2d 937. This result is reached by abandoning the joint and several liability concept utilized in Summers and replacing it with damages equal to one's share in the market. As the court illustrates, if X Manufacturer sold one-fifth of all the DES prescribed for pregnancy and identification could be made in all cases, X would be joined in all cases in which identification could not be made, but liable for only one-fifth of the total damages in these cases. Sindell, 163 Cal. Rptr. at 145, n. 28, 607 P.2d at 937, n. 28 (citing Fordham comment). Having clarified this issue no further, the Sindell court (and the majority here) brush aside the practical problems involved in determining the market and market share, concluding that these are merely matters of proof. To the contrary, I find that there are so many difficulties with the allocation that it cannot be said that any manufacturer's liability would approximate the damages he had caused. Since this was one of the justifications for the theory, its failure negates the entire theory. See Sindell, 163 Cal. Rptr. at 148, 607 P.2d at 940 (dissenting opinion).

a. Lack of Definitions
The first question begging for resolution is what is a substantial share of the market. The only insight we get on this point is that something less than seventy-five percent of the market need be joined. Of course, the lower the percentage required, the less chance there is that the actual "guilty" party will be joined.
Secondly, the court failed to describe what the relevant market would be. Must the plaintiff join a substantial share of the market nationally, statewide, citywide, locally? And since most plaintiffs do not know when their injury occurred or know only that it occurred over a long period of time, what time frame would be relevant for determining the market share?
Where asbestos is the product in question, other issues arise in determining the relevant market which may not have been present in the DES cases. Unlike DES, which is a fungible commodity, asbestos fibers are of several varieties, are used in varying quantities by defendants in their products and differ in their harmful effects. In re Related Asbestos Cases. "Thus, `the total risk created by any manufacturer would be a function of both its share of the market and the relative harmfulness of its products'... ." Starling v. Seaboard Coast Line Railroad, 533 F. Supp. 183, 191 (S.D.Ga. 1982). Yet, the majority opinion today gives us no clue as to whether one's market share will be adjusted accordingly.
A third question which remains unanswered relates to the defendant's liability for the entire judgment. Sindell is unclear on this point, stating only that "[e]ach defendant will be held liable for the proportion of the judgment represented by its share of the market... ." Sindell, 163 Cal. Rptr. at 145, 607 P.2d at 937. If the plaintiff joins sixty per cent of the market and the defendant has a twenty per cent share, we do not know whether the defendant will be responsible for twenty per cent of the total judgment or twenty per cent of *921 sixty per cent of the judgment. Clearly, the defendant's liability will vary greatly depending on which interpretation another court chooses to accept. See 34 Vanderbilt Law Review at 1645-1647.

b. Lack of Uniformity
At the present time, it appears that the market share theory of liability has gained only limited acceptance. See Hardy v. Johns-Manville Sales Corp., 509 F. Supp. 1353 (E.D.Tex. 1981); McElhaney v. Eli Lilly & Co., 564 F. Supp. 265 (D.S.D. 1983); and compare In re Related Asbestos Cases; Tidler v. Eli Lilly & Co., 95 F.R.D. 332 (D.D.C. 1982); Morton v. Abbott Laboratories, 538 F. Supp. 593 (M.D.Fla. 1982); Starling v. Seaboard Coast Line Railroad; Prelick v. Johns-Manville Corp.; Mizell v. Eli Lilly & Co., 526 F. Supp. 589 (D.S.C. 1981); Ryan v. Eli Lilly & Co., 514 F. Supp. 1004 (D.S.C. 1981); Payton v. Abbott Labs. If only a few states choose to follow California, then liability will fall unevenly upon the manufacturers amenable to suit in those states. Unless the states which adopt the theory use the same definitions, an unlikely result, particularly in light of the lack of guidance from the initial decision, liability will be apportioned in a haphazard manner.

c. Problems of Proof
The evidentiary problems in establishing a defendant's market share were not considered by either the Sindell court or the majority. I can but wonder how it would be any easier to determine the defendant's market share than it would have been to determine whether the defendant manufactured the product which actually injured the plaintiff. See Tidler v. Eli Lilly & Co. On the assumption that determination of the market share is the easier task, this theory contributes little to the resolution of the problem for which it was created.
Considering the foregoing practical problems in applying Sindell, I conclude that the majority's reliance on apportionment according to one's market share as a justification for the abandonment of traditional causation requirements is misplaced.

POLICY CONSIDERATIONS
The second justification used by Sindell and the majority to support their departure from the causation requirement is that public policy favors the innocent plaintiff over proven wrongdoers and that the defendant manufacturers are better able to bear the costs.
While the desirable goal of compensating an innocent plaintiff as against two negligent defendants may have been satisfied by the alternative liability theory, it is not accomplished when defendants are selected at random from throughout the country. The connection between the actual harm and the alleged wrongdoing is too tenuous to justify this policy concern.
Moreover, at least one court has indicated that asbestos manufacturers are not as difficult to identify as DES producers:
Asbestos products, unlike DES, are not generically marked but have brand names. (citation omitted) The plaintiffs or their decedents were not exposed in utero but at their places of employment. The employers who purchased the products, as opposed to corner pharmacies, were generally large scale institutions. Therefore, the likelihood that either the asbestos manufacturers or the purchasers have maintained invoice records denoting whose products were used at a specific work site is much greater.
Starling, 533 F. Supp. at 191.
Relieving the plaintiffs of the burden of identifying the actual tortfeasor encourages the injured party to become lazy. There is no motivation to seek the truth; as a matter of fact, in some situations it would be better for the plaintiff not to identify a particular defendant. For example, where the identifiable tortfeasor is insolvent or is not amenable to suit within the forum, plaintiff's interests might best be served by relying on the market share theory. See Sindell, 163 Cal. Rptr. at 149, 607 P.2d at 941 (dissenting opinion). The end result, of course, is that plaintiffs involved in industrywide litigation fare better *922 than the ordinary injured party who must take his defendant as he finds him.
As to the argument that defendants are better able to bear the costs of injury, the dissenting opinion in Sindell correctly points out:
This "deep pocket" theory of liability, fastening liability on defendants presumably because they are rich, has understandable popular appeal and might be tolerable in a case disclosing substantially stronger evidence of causation than herein appears. But as a general proposition, a defendant's wealth is an unreliable indicator of fault, and should play no part, at least consciously, in the legal analysis of the problem. In the absence of proof that a particular defendant caused or at least probably caused plaintiff's injuries, a defendant's ability to bear the cost thereof is no more pertinent to the underlying issue of liability than its "substantial" share of the relevant market. A system priding itself on "equal justice under law" does not flower when the liability as well as the damage aspect of a tort action is determined by a defendant's wealth. The inevitable consequence of such a result is to create and perpetuate two rules of law  one applicable to wealthy defendants, and another standard pertaining to defendants who are poor or who have modest means. Moreover, considerable doubts have been expressed regarding the ability of the drug industry, and especially its smaller members, to bear the substantial economic costs (from both damage awards and high insurance premiums) inherent in imposing an industry-wide liability.
163 Cal. Rptr. at 149, 607 P.2d at 941.
Additionally, the theory espoused in Sindell has the effect of making every manufacturer an insurer not only of its own product, but of all generically similar products made by others. Starling. Ultimately, of course, the manufacturers who are faced with this blanket liability will be reluctant to place new products on the market. Payton, 437 N.E.2d at 190. Certainly such a result is contrary to the best interests of the country.
Accordingly, I find that the policy considerations expressed by Sindell and the majority are not borne out by the adoption of this new theory of liability. To the contrary, the policy arguments militate against the theory.

CONCLUSION
In light of the foregoing, I would hold that since the plaintiff is able to identify several defendants, he is precluded from arguing the applicability of Sindell. As to the merits of Sindell, I conclude that it should not be adopted in this state. Nonetheless, because it is most certainly an issue of great public importance, I would certify the question to the Supreme Court for resolution.
NOTES
[1] The other defendants (except one voluntarily dismissed and one dismissed for lack of personal jurisdiction) were granted final summary judgments, all of which (except those for five appellees voluntarily dismissed on the appeal and for one as to whom the appeal has been severed and stayed pending bankruptcy proceedings) are today reversed by this court. See Copeland, 447 So.2d 922.
[2] Although Celotex's motion also contemplated a striking of the pleadings as a sham, no such striking was effected by the trial court; it simply dismissed the complaint. Our opinion today is therefore limited to a consideration of the sufficiency of the complaint. See Pizzi v. Central Bank & Trust Co., 250 So.2d 895 (Fla. 1971). The appropriateness of summary judgment in this action, with that procedure's different considerations and the facts pertinent thereto, are addressed in Copeland, 447 So.2d 922.
[3] There is voluminous evidence that the asbestos industry has known for decades of the dangers involved in the use of asbestos products. See Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076, 1083-86, 1092-93, 1106 (5th Cir.1973), cert. denied mem., 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974); Hardy v. Johns-Manville Sales Corp., 509 F. Supp. 1353, 1355 (E.D.Tex. 1981), rev'd on other grounds, 681 F.2d 334 (5th Cir.1982).
[4] See also the cases collected at footnote 5 of Copeland, 447 So.2d 922, addressing this issue from a limitation of action perspective.
[5] In so doing we note that we are venturing into an area not yet explored by the Florida Supreme Court and that our result today is, therefore, not precluded by Hoffman v. Jones, 280 So.2d 431 (Fla. 1973).
[6] See supra note 3.
[7] We note that the dissenter has ably compiled the various arguments that have been offered in opposition to the market share theory of liability.
[8] By a separate order we have certified to the supreme court that whether Florida should adopt the market share theory of liability is a question of great public importance.
[1] I would also add here another concern I have about reaching the Sindell issue. The plaintiffs, by their complaint, reflect uncertainty as to the theory which they sought to use. By paragraph 21, the plaintiffs alleged in part:

Under the doctrine of enterprise liability or alternative liability as described in Sindell v. Abbott Laboratories, 26 Cal.3d 588, 163 Cal. Rptr. 132, 607 P.2d 924 (1980), this court should apply joint and several liability to each Defendant found by the Jury to have supplied such products to which there is a substantial likelihood that Plaintiff was injuriously exposed.
As is apparent from a reading of Sindell and the opinion today, Sindell did not adopt enterprise or alternative liability as its theory of recovery. Nor did it impose joint and several liability. Either the plaintiff fails to recognize the distinction between the three theories or he is intending to argue for alternative and enterprise liability and not market share liability. The briefs filed in this court do not clarify the theory under which the plaintiffs travel. The failure of the attorneys to address the issue which the majority decides contributes to my opinion that the issue should not be reached.
[2] For a further discussion of the lack of definitions see the section infra entitled Practical Considerations.
[3] Market share liability might be a bit more palatable if the plaintiffs had the burden of establishing at least some proximity to the defendants' products. For example, the worker in a factory might be required to prove that the defendant-asbestos manufacturer shipped goods to the factory during the time the defendant was employed there, but not be required to prove whether the defendant's product was in the room where plaintiff worked. See, e.g., Abel v. Eli Lilly & Co. (alternative liability theory utilized where complaint alleged that defendants were all of the known manufacturers of DES whose products were distributed in Michigan during the relevant time period).